1    IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
2
     -----------------------X
3    In Re:                  Case No. 07-35257-cgm
                             Chapter 7
4    ANN-MARIE WESTRIDGE,

5         Debtor.           Poughkeepsie, NY
     -----------------------X February 20, 2009
6

7

8                    TRANSCRIPT OF HEARING
             RE: MOTION FOR SANCTIONS FOR VIOLATION OF
9                        AUTOMATIC STAY

10

             BEFORE THE HONORABLE CECELIA G. MORRIS
11             UNITED STATES BANKRUPTCY COURT JUDGE

12
     APPEARANCES:
13
     For Debtor/Movant:   MIKCHAEL D. PINSKY, ESQ.
14
     For Respondent:      WARREN  GREHER, ESQ.
15                        Greher Law Office, P.C.

16
     ALSO PRESENT:
17
                         MR. STEVE FORD
18                       MRS. KATHIE FORD
                         MS. ANN-MARIE WESTRIDGE
19

20

21

22   Transcriber:        KAREN SCHMIEDER, CSR, RDR
                         Schmieder & Meister, Inc.
23

24      The Proceedings were recorded by electronic
     sound recording; transcript was produced by a
25              transcription service.

1           THE COURT:  Ann-Marie Westridge.

2     State your name and affiliation.

3           MR. PINSKY:  Mike Pinsky, Your

4     Honor, for the movant and debtor, Ann-Marie

5     Westridge.

6           MR. GREHER:  Good morning, Your

7     Honor.  Warren Greher on behalf of the

8     respondents, Kathie and Steve Ford.

9           THE COURT:  Very good.  Witnesses,

10    I need to have who the witnesses are, and do

11    we sequester witnesses?

12          MR. GREHER:  I'd ask that they be

13    sequestered.

14          THE COURT:  Okay, very good.

15          MR. PINSKY:  Very good, Your Honor.

16          The witnesses listed in the joint

17    pretrial for the movant are the debtor

18    herself, Ann-Marie Westridge, this is in

19    Section VIII.

20          THE COURT:  Okay, she stays in the

21    courtroom obviously.

22          MR. PINSKY:  Yes, ma'am.  Andrea

23    Malin, who is general counsel to the debtor,

24    William Helgerman.

25          THE COURT:  He is a witness for

1    both sides or on the witness list for both?

2                MR. PINSKY:  On the witness list

3    for both.  And Sandra Raymond.

4                THE COURT:  Raymond, R-A-Y-M-O-N-D?

5                MR. PINSKY:  Yes, ma'am.

6                THE COURT:  Is Miss Raymond in the

7    courtroom?

8                MR. PINSKY:  She is.

9                THE COURT:  Okay, if Miss Raymond,

10   Miss Malin and Mr. Helgerman would come and

11   stand in the middle, right there, and I am

12   going to swear you in right now.  Raise your

13   right hand:

14               Do you solemnly swear the testimony

15   you will give in this Court will be true and

16   correct to the best of your knowledge and

17   belief, so help you God?

18               MS. MALIN:  Yes, I do.

19               MR. HELGERMAN:  Yes, I do.

20               MS. RAYMOND:  Yes, I do.

21               THE COURT:  Okay, you all may

22   leave.  There are conference rooms out here;

23   you can stay in there, and then we'll come

24   and get you whenever we need you.  Just take

25   your stuff with you, just so it's with you,

1    you'd be safe.  Thank you.

2              MS. MALIN:  Thank you, Your Honor.

3              THE COURT:  Thank you.

4              Mr. Pinsky, it is your action.

5              MR. PINSKY:  Yes, ma'am.  Judge, do

6    you want us to get right to the testimony?

7              THE COURT:  Well, I would like to

8    first look through the exhibits.

9              MR. PINSKY:  Yes, ma'am.

10              THE COURT:  We had some exhibits;

11   there are six exhibits, is that correct?

12              MR. PINSKY:  That's correct, Judge.

13              THE COURT:  Are they stipulated to?

14              MR. PINSKY:  As to authenticity

15   only for numbers 2 through 6.

16              THE COURT:  Oh, well, you don't

17   have a problem with 1?

18              MR. PINSKY:  As to 1, stipulated as

19   to authenticity and admissibility.

20              THE COURT:  Yes, I was going to

21   say, 1 is public record, so even if you

22   don't, it's in.

23              MR. GREHER:  I did, so.

24              THE COURT:  Yes, because that's

25   what it is.  Okay, number 2, authenticity,

```
1      but what else about it?

2              MR. PINSKY:  Mr. Greher, I believe

3      has an objection.

4              THE COURT:  You do?

5              MR. GREHER:  Your Honor, I have

6      objections with respect to Exhibits 3, 4 --

7              THE COURT:  We are on 2, let's do

8      2.

9              MR. GREHER:  My objection with

10     respect to Exhibit 3 is with --

11             THE COURT:  2, 2, 2.

12             MR. GREHER:  I'm sorry, 2, is one

13     of relevancy, Your Honor.  The issues before

14     this Court are set forth in the motion

15     papers.  There are specifically two issues

16     that I think have to be addressed at this

17     hearing, and that would be the alleged

18     incident that took place on May 30th and the

19     alleged incident that took place on October

20     23rd.

21             THE COURT:  Okay, you will

22     stipulate to the fact that there was an

23     objection to claim filed?

24             MR. GREHER:  For whatever the

25     relevancy that is, yes.
```

```
 1                    THE COURT:  Okay, that's enough.
 2                    MR. PINSKY:  Well, Your Honor,
 3          there is a claim of Mr. Ford, which he
 4          signed and filed under penalty of perjury --
 5                    THE COURT:  Okay, well, then let's
 6          have that one separate.  Because that one, I
 7          don't think there would be any objection to
 8          that.  Here it is.  Can we just make that
 9          one No. 2, Proof of Claim?
10                    MR. GREHER:  Once again, with
11          respect to that, yes.
12                    MR. PINSKY:  Judge, I think that's
13          fine.
14                    THE COURT:  Okay, right now,
15          stipulated to is the Proof of Claim, and
16          that's all we've got on this one at this
17          point.  If you need anything else, you can
18          do something else on it.
19                    MR. PINSKY:  Very good.
20                    THE COURT:  All right, No. 2.  Now
21          we are at No. 3, you had an objection to
22          that?
23                    MR. GREHER:  Yes, once again,
24          relevancy with respect to this proceeding,
25          Your Honor.
```

1           THE COURT:  I will take that under

2    account when it gets to the point of this

3    being moved in.

4           MR. PINSKY:  Very good, Your Honor.

5           THE COURT:  Okay, so we have 1 and

6    2, 3, relevancy, objection to confirmation,

7    same thing?

8           MR. GREHER:  Yes.

9           MR. PINSKY:  This is the response

10    to 3, Your Honor.  So to the extent 3 is

11    relevant, 4 will follow, and if it's not, it

12    won't.

13           THE COURT:  Right, exactly.

14           MR. PINSKY:  5 and 6 are the

15    attorneys' fees and disbursement records.

16           THE COURT:  Which might be relevant

17    at the time we get to them.

18           MR. PINSKY:  Yes, ma'am.  If Your

19    Honor finds that there was willful

20    violation, then those will become relevant.

21           THE COURT:  Exactly.  Okay, good.

22    So that's all the exhibits we have?

23           MR. PINSKY:  Yes, ma'am.

24           MR. GREHER:  Yes.

25           THE COURT:  Very good.  So we have

1    got those pretty much taken care of.  Any

2    other preliminary matters?

3              MR. PINSKY:  I don't believe so.

4              THE COURT:  Okay, at this moment --

5    I will tell you at the end, but I want you

6    to take notes, because more than likely,

7    after a trial you'll have to give me

8    findings of fact and conclusions of law.

9              MR. PINSKY:  Yes, ma'am.

10              THE COURT:  And you will need to do

11    those either on e-mail filing or -- either

12    e-mail or on disk, and I will limit those

13    when we get there.  But I just want you all

14    to keep that in mind when you're doing the

15    trial.

16              MR. PINSKY:  Very good, Your Honor.

17    And just as a housekeeping matter, the

18    parties did submit proposed findings and

19    conclusions as part of the pretrial.

20              THE COURT:  Yes, and I have that.

21    I have that right there, and I've gone

22    through that several times.  I've read it

23    over, so I have them.

24              MR. PINSKY:  Yes, ma'am.  And we'll

25    clean them up at the end.

1          THE COURT:  Yes, that's what I want

2    you to do.  Because at the end what you'll

3    have to do is clean up what came in as

4    testimony, and I want you citing to the

5    transcript.  So the post-trial ones would

6    say "found at," so you have exactly the

7    evidence.

8          MR. GREHER:  So we should be

9    ordering this transcript, is what you're

10   saying, before we make any further

11   submissions?

12         THE COURT:  Exactly.

13         MR. GREHER:  Okay, that's fine.

14         THE COURT:  Very good.

15         Mr. Pinsky, you're on first.

16         MR. PINSKY:  Your Honor, do you

17   care to hear any opening remarks?

18         THE COURT:  I have read the joint

19   pretrial.  I think I am pretty clear on the

20   issues.  Unless there is something that you

21   didn't put in the pretrial, and I would be

22   not happy about that.

23         MR. PINSKY:  No, ma'am.  I think

24   we're ready to go.

25         THE COURT:  Very good.

1                MR. PINSKY:  The debtor calls

2        Ann-Marie Westridge.

3                THE COURT:  Very good, Miss

4        Westridge, I didn't have you sworn in.  And

5        the Fords, I need to have all of you stand

6        and raise your right hand:

7                Do you solemnly swear the testimony

8        you're about to give is the truth, the whole

9        truth and nothing but the truth, so help you

10       God?

11               MS. WESTRIDGE:  Yes.

12               MRS. FORD:  Yes.

13               MR. FORD:  Yes.

14               THE COURT:  Very good.  Miss

15       Westridge, take the witness stand.  State

16       your full name.

17               THE WITNESS:  Ann-Marie Westridge.

18               THE COURT:  And Miss Westridge,

19       what's your address, please.

20               THE WITNESS:  12 Laurel lane,

21       Otisville, New York 10963.

22               THE COURT:  And let me remind you

23       you're under oath.

24               THE WITNESS:  Yes.

25               THE COURT:  Mr. Pinsky.

1           MR. PINSKY:  Yes, ma'am.

2

3           (ANN-MARIE WESTRIDGE, having been

4      first duly sworn, testified as follows:)

5

6   DIRECT EXAMINATION

7   BY MR. PINSKY:

8   Q.   Miss Westridge, you are that same Ann-Marie

9        Westridge who is the debtor in this Chapter 7

10       case, are you not?

11  A.   Yes.

12  Q.   Do you know Steven Ford?

13  A.   Yes.

14  Q.   And do you know Kathie Ford?

15  A.   Yes.

16  Q.   Are they present in the courtroom today?

17  A.   Yes.

18           THE COURT:  Okay, we are going to

19       need to have some help here.  Mr. Greher

20       cannot hear the witness, so you're going to

21       need to move that microphone closer to you.

22       Now then, let's do a test.  Just speak into

23       it.

24           THE WITNESS:  Hello.

25           THE COURT:  Much better.  Thank

1       you.

2               Mr. Greher, you can't see her

3       there?

4               MR. GREHER:  It's a little

5       difficult.

6               MR. PINSKY:  I can sit down, Judge.

7               MR. GREHER:  I can move around.

8       I'll move around.  It's all right.

9               THE COURT:  All right, thank you.

10

11    BY MR. PINSKY:

12    Q.   And Miss Westridge, how do you know the Fords,

13         Steven Ford and Kathie Ford?

14    A.   Through my friend Billy.

15    Q.   Okay.

16               THE COURT:  Tell me the full name

17         of your friend Billy.

18               THE WITNESS:  William Michael

19         Helgerman.

20

21    BY MR. PINSKY:

22    Q.   And did you formerly have a romantic

23         relationship with Mr. Helgerman?

24    A.   Yes.

25    Q.   And was there a relationship between Mr.

```
 1          Helgerman and one of the Fords, a familial

 2          relationship?

 3    A.    Yes.

 4    Q.    And what was that?

 5    A.    Kathie Ford is his sister.

 6    Q.    Very good.  And how long have you known the

 7          Fords?

 8    A.    Seven years, approximately.

 9    Q.    And did you know them in a personal capacity or

10          a business capacity or both?

11    A.    Both.

12    Q.    And what was that business capacity?

13    A.    Through the company that I owned.

14    Q.    What was that company?

15    A.    All Points Construction.

16    Q.    And what was the business of All Points

17          Construction?

18    A.    New home building.

19    Q.    All right.  And what business relationship did

20          one or both of the Fords have with All Points

21          Construction; how did they participate in your

22          business?

23    A.    Financially.

24    Q.    Financially?

25    A.    Um-hmm.
```

1    Q.    And specifically how financially?

2    A.    He invested some money into my company.

3    Q.    And when you say "he" you mean Steven Ford?

4    A.    Steven, yes, because that's who I dealt with.

5    Q.    And how did that relationship work; you say he

6        invested money, what was the arrangement?

7    A.    The first -- well, I dealt with him on a couple

8        of different ones. The first one was a loan of

9        $50,000.

10    Q.    Okay.

11    A.    Which was paid back with interest.

12    Q.    Okay, very good. And was that a personal loan

13        or a business loan?

14    A.    A business loan.

15    Q.    All right. And after -- and how did you pay him

16        back; what did you pay him back from?

17    A.    By check.

18    Q.    Where did the money come from?

19    A.    Oh, from the building, from the sale of a house.

20    Q.    Okay, very good. What was the next business or

21        financial engagement between All Points

22        Construction and Mr. Ford?

23    A.    The investment.

24    Q.    And how much did Mr. Ford invest?

25    A.    $50,000.

1   Q.   And was that invested in connection with a

2        specific construction project?

3   A.   Yes.

4   Q.   And how did that project turn out?

5   A.   Turned -- I don't understand -- how did that

6        turn out.

7              THE COURT:  Was it a success or was

8        it a failure?

9   A.   No, it was a success.

10  Q.   A success.  And was he repaid his investment?

11  A.   No, he was paid commissions.

12  Q.   He was paid commissions?

13  A.   Yes.

14  Q.   All right.  So how much of that $50,000 did he

15       get back?

16  A.   I don't recall.

17  Q.   Okay, did he get some of it or all of it?

18  A.   Some of it, yes.

19  Q.   Okay.  Did you continue to do business; did All

20       Points Construction continue to do business with

21       Mr. Ford after --

22             MR. GREHER:  Note my objection to

23       the form of the question, Your Honor.  It

24       was indicated that the relationship,

25       whatever it was, was a financial one, not a

1       business one, so.

2                    MR. PINSKY:  I'll rephrase.

3                    THE COURT:  Thank you.

4

5    BY MR. PINSKY:

6    Q.   Was there a further financial dealing between

7         All Points Construction and Mr. Ford?

8    A.   No.

9    Q.   Did you at some point encounter difficulty with

10        the business of All Points Construction?

11   A.   Yes, I did.

12                   MR. GREHER:  Objection, leading.

13   Q.   Is All Points Construction still in --

14                   THE COURT:  I was going to say wait

15        a minute.  I can rule on that.

16                   MR. PINSKY:  Yes, ma'am.

17                   THE COURT:  Tell me why that's

18        leading?

19                   MR. GREHER:  He's suggesting the

20        answer to the question.  It's a classic

21        leading question.

22                   THE COURT:  Okay, rephrase.  I'll

23        sustain the objection, even though I'm not

24        sure about it.  Go ahead.

25                   MR. PINSKY:  Very good, Your Honor.

1    BY MR. PINSKY:

2    Q.   Miss Westridge, is All Points Construction still

3         in business?

4    A.   No.

5    Q.   Why is it no longer in business?

6    A.   I became ill and couldn't run the business any

7         longer.

8    Q.   And approximately when did that happen?

9    A.   2005.

10   Q.   And was your illness also in 2005?

11   A.   Yes.

12   Q.   Was it a serious illness?

13   A.   Yes.

14   Q.   What was the nature of the illness, if you're --

15   A.   There were several.  I had cervical cancer; I

16        have a blood disorder.

17   Q.   And what did you do after you encountered these

18        health problems with your business?

19              MR. GREHER:  If I may, Your Honor,

20         I would object at this time on the grounds

21         of relevancy.  I don't know where we are

22         going with respect to this.  I understand

23         it's background, but I don't know if we need

24         it.

25              THE COURT:  We're laying

1       background.  I'm not sure we need it either.

2       I'm listening for a little while longer.

3       Why don't we just ask:  Did the debtor

4       personally guaranty the loans Ford made to

5       All Points?

6               MR. PINSKY:  Okay, sure.

7               THE COURT:  Would that move us

8       along faster?

9               MR. PINSKY:  Actually, I'm not sure

10      it would, Judge.  I'll tie it up real quick.

11              THE COURT:  Okay.

12    BY MR. PINSKY:

13    Q.   When did you file your bankruptcy case, Miss

14       Westridge?

15    A.   2007 -- I believe.

16    Q.   Did you list Mr. Ford as a creditor?

17    A.   Yes.

18              THE COURT:  Let the record reflect

19       the case was filed in 2007.

20              MR. PINSKY:  Yes, ma'am.  Your

21       Honor, may I approach?

22              THE COURT:  Yes, you may.

23    Q.   Miss Westridge, I show you a copy of what's been

24       marked as debtor's Exhibit 1 and ask you if you

25       recognize the document?

1  A.  Yes.

2  Q.  And what is it?

3  A.  It is a voluntary petition for my Chapter 7.

4  Q.  And if you would, take a brief look at it and

5      tell me if that is in fact the petition that you

6      reviewed and signed for filing with the

7      Bankruptcy Court?

8  A.  Yes.

9  Q.  Did you list Steven Ford as a creditor in your

10     bankruptcy case?

11 A.  Yes, I did.

12 Q.  Do you recall going to a creditors' meeting in

13     your bankruptcy case?

14 A.  Yes.

15 Q.  How many creditors' meetings were there?

16 A.  I believe two.

17 Q.  All right, under what chapter was this case

18     originally filed?

19 A.  Chapter -- I believe it was Chapter 7.

20 Q.  And at some point was this case converted to

21     another chapter?

22 A.  Yes.

23          MR. GREHER:  Your Honor, at this

24     time we'll stipulate that it was filed as a

25     7, converted to a 13 and then converted back

 1      to a 7.

 2              THE COURT:  Very good, thank you.

 3   BY MR. PINSKY:

 4   Q.   Do you recall going to a creditors' meeting in

 5        the Chapter 13 case?

 6   A.   Yes.

 7   Q.   And who was present at the creditors' meeting in

 8        the Chapter 13 case, if you recall?

 9   A.   The people I recall is myself, my attorney,

10        Andrea Malin, my sister, Sandra Raymond, Kathie

11        and Steve Ford, Stan -- and I'm not sure of his

12        last name, Edward Dummell, and that's all I can

13        recall.

14   Q.   All right.  And can you describe for us what

15        interaction there was between you and either

16        Kathie or Steven Ford at the Chapter 13

17        creditors' meeting?

18   A.   In the courtroom?

19   Q.   In the courtroom -- in the 341 meeting room,

20        yes, ma'am?

21   A.   Kathie asking questions, Steven asking

22        questions.  That's about all I remember.

23   Q.   All right, and --

24   A.   Specific questions I don't know, I don't

25        remember.

1   Q.   And after the meeting was concluded, where did

2        you go?

3   A.   I -- we left -- my sister and I left the

4        courtroom.

5   Q.   And your sister is named?

6   A.   Sandra Raymond.

7   Q.   And when you left the courtroom where did you

8        go?

9   A.   We were walking outside, and that's when we had

10       seen Kathie and Steve outside.

11  Q.   All right, and what happened when you went

12       outside the building where the 341 creditors'

13       meeting was held?

14  A.   Kathie Ford started yelling and screaming that

15       she wanted her money, and then an altercation

16       happened.

17  Q.   What was the altercation?

18  A.   Steven went to grab my arm.  He said he wanted

19       to talk to me.  My sister then jumped in the

20       middle.  Andrea, at that point, had told my

21       sister, Sandra, and I to come inside.

22  Q.   All right.  Do you recall about how long the

23       incident between you and the Fords lasted

24       outside the 341 meeting room?

25  A.   If I had to guess, two minutes.

```
 1   Q.   Two minutes, all right.  And what happened after

 2        you went back inside with Miss Malin?

 3   A.   Miss Malin told me to call the police.

 4   Q.   All right.  And did you leave the building

 5        again?

 6   A.   No, because I was scared to.  I didn't want

 7        to -- because Steven had made the comment that

 8        he would wait for me out in the parking lot.

 9   Q.   So how did you exit the building?

10   A.   Andrea had called the court marshal to escort my

11        sister, Sandra, and I to my vehicle.

12   Q.   And is that how you got to your car?

13   A.   Yes.

14   Q.   All right, and you were able to leave from your

15        car to wherever you were heading?

16   A.   Yes.

17   Q.   Did there come a time where you had another

18        interaction with either Kathie or Steven Ford

19        after the 341 meeting in your Chapter 13 case?

20   A.   Yes.

21   Q.   And what was that interaction?

22   A.   Kathie Ford came to my home.

23             THE COURT:  That's not responsive

24        to the question.  You asked the 341; she

25        said her home.
```

1              MR. PINSKY:  Actually, Your Honor,

2        I asked her if there came another

3        interaction after the 341 meeting.

4              THE COURT:  Oh, I'm sorry.

5              MR. PINSKY:  But I'll ask it again.

6              THE COURT:  All right.

7    BY MR. PINSKY:

8    Q.   After this incident at the 341 meeting room,

9         when was the next time that you had a discussion

10        or a meeting with either Steven or Kathie Ford?

11   A.   When she came to my home in October.

12   Q.   And she is?

13   A.   Kathie Ford.

14   Q.   Kathie Ford.  And where was your home, where was

15        that located?

16   A.   116 Tote Pasture Road in Westown, New York.

17   Q.   All right.  And who was present on that day in

18        October when Kathie Ford came to your home in

19        Westown?

20   A.   My friend William.  He actually answered the

21        door, because it was in the evening, and I was

22        cooking dinner.

23   Q.   So were you in the kitchen when Miss Ford came

24        to the door?

25   A.   Yes.

1   Q.   All right, so how did you know she was there?

2   A.   Because I heard my friend yelling and screaming,

3        and I went to the door, and that's when I had

4        seen --

5             THE COURT:  Tell us everything, we

6        are in Court.  Let's hear it.

7             I'm sorry, Mr. Pinsky, I know

8        you've prepped this witness in some ways --

9        well, you're supposed to.  You've got to

10       tell the story.  Don't just pause.  You were

11       in the kitchen, he was at the door.  C'mon,

12       tell us.  I'm ready and waiting.  We only

13       have a certain amount of time here.

14  BY MR. PINSKY:

15  Q.   There you go.  What happened, just let -- go

16       ahead and tell us the story?

17            THE COURT:  Let's hear it.

18  A.   I went to the door, because he was yelling and

19       screaming, and it was Kathie Ford.  I asked her

20       to leave my property, and she told me no, she

21       refused, that it was none of my business.  So

22       again I asked her to leave.  William is yelling

23       and screaming to get off the property, it was

24       illegal for her to be there, and she left.

25  Q.   Okay, all right.  Thanks.

1

2              MR. PINSKY:  Pass the witness.

3              THE COURT:  I have some questions

4     before you get up.  We had two 341s, right?

5              MR. PINSKY:  Yes, ma'am.

6              THE COURT:  When was the 341 that

7     the Fords were at, when was that?

8              THE WITNESS:  I believe in May.

9              THE COURT:  In May?

10             THE WITNESS:  Yes.

11             THE COURT:  So from May until

12    October you didn't see them; they didn't

13    come to your house; they didn't do anything?

14             THE WITNESS:  That's correct.

15             THE COURT:  Miss Malin -- what were

16    the questions at the 341 that you said --

17    you said earlier that they asked you some

18    questions, what were those questions?

19             THE WITNESS:  They didn't ask me

20    any questions directly in the 341 meeting;

21    they were asked --

22             THE COURT:  Well, what did they say

23    in the 341?

24             THE WITNESS:  They brought up why

25    my house was listed for so much money, and

1       she wanted to get paid, meaning Kathie Ford.

2               THE COURT:  So they did not ask you

3       any questions; they just simply said the

4       house needs to be sold at a certain amount

5       of money?

6               THE WITNESS:  That's what I

7       remember.  There was a lot of questions that

8       were asked during that meeting, and honestly

9       I don't remember all of them.

10               THE COURT:  Okay, Miss Malin told

11       you to call the police; did you call the

12       police?

13               THE WITNESS:  No, I didn't.

14               THE COURT:  And then the marshals

15       escorted you to the car.  Was Steve in the

16       parking lot, like he threatened to be?

17               THE WITNESS:  No.

18               THE COURT:  And when Miss Ford said

19       "none of your business," to you at your

20       house, what did you take that to mean?  You

21       just testified that Miss Ford and William

22       were having an altercation at your front

23       door.  You asked her to leave, and she said

24       "stay out of this, it's none of your

25       business."

1           THE WITNESS:  Right, cause she

2      didn't want to talk to me directly.  She

3      wanted to talk to her brother about the --

4      about the money issue.

5           THE COURT:  The money that you

6      owed, that you owed to them?

7           THE WITNESS:  Yes.

8           THE COURT:  Okay, your witness, Mr.

9      Greher.

10          MR. GREHER:  Thank you, Your Honor.

11

12   CROSS-EXAMINATION

13   BY MR. GREHER:

14   Q.   You had indicated on direct testimony that you

15        knew Mr. and Mrs. Ford for approximately seven

16        years?

17   A.   Approximately, yes.

18   Q.   And did you know them in both a social setting

19        and a business/financial setting, or was it just

20        business/financial setting?

21   A.   It was both.

22   Q.   Had they been to your house before?

23   A.   Steven has, yes.

24   Q.   Okay, Kathie had never been to your house

25        before?

1   A.   Not to my knowledge, no.

2   Q.   And you indicated there was a point in time

3        where you had some type of a relationship with

4        her brother, William Helgerman, correct?

5   A.   Yes.

6   Q.   For what period of time did you have that

7        relationship?

8   A.   Approximately six and a half years.

9   Q.   So all during the time that you knew the Fords

10       you were having your relationship with Mr.

11       Helgerman?

12  A.   Correct.

13  Q.   Was he living with you?

14  A.   No.

15  Q.   Did HE spend any nights at your house?

16  A.   Yes.

17  Q.   Okay, and were you married at this time,

18       separated?

19  A.   To William?

20  Q.   No, to --

21                THE COURT:  Relevance.

22                MR. GREHER:  I'll withdraw the

23       question.

24                THE COURT:  Thank you.

25                MR. GREHER:  Thank you.

1   Q.   Now, you testified that there was a point in

2        time when Steve Ford lent you $50,000, is that

3        correct?

4   A.   Correct.

5   Q.   And you indicated that the first $50,000 that he

6        gave you was also to the business, or was that

7        to you personally?

8   A.   It was to the business.

9   Q.   Do you recall signing a promissory note?

10  A.   No, I did not sign a promissory note.

11  Q.   Do you recall ever seeing a promissory note that

12       purported to have your signature on it?

13  A.   No.

14  Q.   You never saw one?

15  A.   No, I had seen -- I'm sorry, I had seen one

16       after the fact.

17  Q.   Okay, so you did see a promissory note, right?

18  A.   A note that I did not sign.  I never signed a

19       promissory note.

20  Q.   Okay, but you paid back this $50,000, is that

21       correct?

22  A.   The initial $50,000, yes.

23  Q.   Okay, and did the money from that $50,000 come

24       from your business?

25  A.   Yes.

1   Q.   And was it paid back in a timely manner?

2             MR. PINSKY:  Objection, lack of

3        foundation.

4   Q.   Well, what was your understanding of the terms

5        of repayment?

6             THE COURT:  Do I need to rule, or

7        are you going to move right along?

8             MR. GREHER:  I'll move right along,

9        Judge, thank you.

10            THE COURT:  Thank you.

11   BY MR. GREHER:

12  Q.   There came a time when there was further money

13       invested, is that correct?

14  A.   Correct.

15  Q.   Okay, and was that also $50,000?

16  A.   Yes.

17  Q.   Was it given to you by check or by cash?

18  A.   By check.

19  Q.   Okay.  And you stated that it was your

20       understanding that that was to be paid back when

21       homes were sold, is that correct?

22  A.   Well, what the understanding was is that he

23       would receive commissions off of that $50,000.

24  Q.   What does that mean, commissions?

25  A.   He was getting one percent of the houses that I

1          had sold.

2     Q.   Okay.  And if the one percent of the houses that

3          you sold did not total up to $50,000, what was

4          the understanding as to how the other -- the

5          balance of that $50,000 would be paid?

6     A.   There was no discussion.

7     Q.   Okay.  So it was kind of a risky investment,

8          don't you think?

9               MR. PINSKY:  Objection,

10         argumentative.

11              THE COURT:  Sustained.

12    BY MR. GREHER:

13    Q.   How much were the houses selling for?

14              MR. PINSKY:  Objection, lack of

15         foundation.

16              THE COURT:  Sustained.

17    Q.   Well, were the houses sold?

18              MR. PINSKY:  Objection, lack of

19         foundation.  What houses?

20    Q.   The houses that were out of the sale which Mr.

21         Ford was to receive one percent commission?

22              THE COURT:  That's a better

23         question.

24    Q.   Were those houses sold?

25    A.   Yes.

1    Q.    Were there a specific number of houses?

2    A.    That we agreed upon?

3    Q.    Yes.

4    A.    No.

5    Q.    Well, how many houses -- on how many sales was

6          Mr. Ford supposed to get a commission?

7    A.    We never had a set amount.

8    Q.    Okay, how many sales were there?

9                MR. PINSKY:  Object to the form of

10         the question.  There is no temporal

11         relationship.

12               THE COURT:  He can ask those

13         questions.  I just want to know where we're

14         going.  I don't mind you asking the

15         questions, but where are we going; what are

16         we about here?

17               MR. GREHER:  Well, I'm just about

18         done with this line of questioning, Judge,

19         if I --

20               THE COURT:  Oh, is there a written

21         agreement, or was it all verbal, is that

22         what we are getting at?

23               MR. GREHER:  Yes.

24               THE COURT:  Was there a written

25         agreement, or was it all verbal, that's what

 1          I would like to know too.

 2                    THE WITNESS:  It was verbal.

 3                    MR. GREHER:  Okay.

 4      BY MR. GREHER:

 5   Q.   There came a time that you decided that you

 6        needed to file a personal bankruptcy petition,

 7        is that correct?

 8   A.   Correct.

 9   Q.   Did you ever file a bankruptcy petition for your

10        business?

11                    MR. PINSKY:  Objection, relevance.

12                    THE COURT:  Overruled.  I want to

13        hear the answer to this.

14   A.   For my business, no.

15                    THE COURT:  All Points.

16      BY MR. GREHER:

17   Q.   Did there come a time when you met with an

18        attorney for the purposes of discussing the

19        filing of a bankruptcy petition either for you

20        personally or for your business?

21   A.   Yes.

22   Q.   And do you recall when that first conversation

23        or conference was?

24   A.   I believe it was January of 2007.

25   Q.   And was that with somebody in Miss Malin's

1      office?

2   A.  Yes.

3   Q.  Oh, did you speak to any other attorneys prior

4       to speaking to Miss Malin?

5   A.  No -- yes, Tom Genova.

6   Q.  Okay, at that first meeting, did you in fact

7       meet with Miss Malin?

8              MR. PINSKY:  Objection,

9       attorney/client privilege.  We are getting

10      into an area --

11             THE COURT:  You're dancing here,

12      because you're getting close to privilege.

13  Q.  At the time that you met with --

14             THE COURT:  I will sustain the

15      objection, but I'll listen to the questions.

16             MR. GREHER:  Thank you, Your Honor.

17  Q.  At time that you met with Miss Malin did you

18      bring with you a list of all of your creditors,

19      everybody that --

20             MR. PINSKY:  Objection, privilege.

21             MR. GREHER:  Judge, how is that

22      possibly privilege?

23             MR. PINSKY:  Communications between

24      attorney and client relating to --

25             THE COURT:  For the purpose of

1          litigation it is privileged information.  I

2          am going to sustain that objection, but

3          here's a root -- I've got to think of a

4          question myself that doesn't go to privilege

5          either.

6                    Are all of your creditors listed on

7          this petition?

8                    THE WITNESS:  Yes.

9                    THE COURT:  And are they the

10         business creditors too?  I've looked at it

11         to see -- you said on some of them they are

12         business creditors; are your business

13         creditors also listed on this list?

14                   THE WITNESS:  Yes, most of them are

15         my business creditors.

16                   THE COURT:  Okay.

17    BY MR. GREHER:

18    Q.   At time that -- did there come a time subsequent

19         to your meetings with --

20    A.   Yeah, exactly.

21    Q.   -- with Miss Malin or representatives of her

22         firm that you went back to the office to review

23         a bankruptcy petition that was prepared on your

24         behalf?

25    A.   I don't understand the question.

1   Q.   Well, before filing a bankruptcy petition did

2        you review the information that you previously

3        had given your attorneys for the purposes of

4        putting together your paperwork?

5             MR. PINSKY:  That's communications,

6        Mr. Greher.  That's attorney/client

7        communications.

8   Q.   Well, did you review a bankruptcy petition

9        before signing it?

10  A.   Yes.

11  Q.   And is that the bankruptcy petition that's in

12       front of you today?

13  A.   Yes.

14  Q.   And at the time that you reviewed it did you

15       determine that the information contained in that

16       petition was true and accurate?

17            MR. PINSKY:  Objection, to the

18       extent it calls for a legal conclusion only.

19  Q.   Did you have any reason to doubt the accuracy of

20       the information that was in your petition?

21            THE COURT:  Mr. Greher, will you

22       let me rule when there's an objection.

23            MR. GREHER:  I'm sorry, Judge.

24            THE COURT:  I mean it would just

25       make my life easier and make the record look

1       a lot cleaner.

2               MR. GREHER:  I apologize.

3               THE COURT:  I sustain the

4       objection.  Your second question, though, is

5       good.

6               MR. GREHER:  I wish I could

7       remember it.

8               THE COURT:  Basically, did you

9       review them, and when you reviewed them, did

10      you find it to be true and correct at the

11      time you did it?

12  A.  Yes, according to what my attorney told me to

13      do.

14              THE COURT:  That's not what we

15      asked, and that's privileged.

16              So go ahead, Mr. Greher.

17  BY MR. GREHER:

18  Q.  Did you have to make any changes in the petition

19      from the time you went to review it until it was

20      actually filed?

21              MR. PINSKY:  Objection.

22              THE COURT:  Sustained.  Don't

23      answer that question.

24              MR. GREHER:  In any event, a

25      petition was filed in your behalf, and that

1       petition is now before you, is that correct.

2   A.  Correct.

3   Q.  And is Steve Ford listed as a creditor on that

4       petition?

5   A.  Yes.

6   Q.  Okay.  Is Kathie Ford listed as a creditor on

7       that petition?

8   A.  No.

9   Q.  Did Kathie Ford ever lend you any money?

10  A.  No.

11  Q.  Now, there came a time when you testified that

12      you went to a 341 meeting at the Bankruptcy

13      Court in I guess it was May of 2007, is that

14      correct?

15  A.  Correct.

16  Q.  And we are talking about at the time when you

17      were in Chapter 13?

18  A.  Yes.

19  Q.  Okay.  How did you get to the meeting that day?

20  A.  I'm sorry?

21  Q.  How did you get there that day?

22  A.  I drove.

23  Q.  And did you drive by yourself, or was your

24      sister with you?

25  A.  My sister, Sandra, was with me.

1   Q.   Okay, was it her car or your car?

2   A.   I don't remember.

3   Q.   Could it have been her car?

4   A.   It could have been, yes.

5   Q.   And if it was her car, would you have driven it

6        or would she have driven it?

7   A.   She would have driven it.

8   Q.   Okay.  Are you under any medication now that

9        impacts your ability to remember?

10  A.   I've gone through several surgeries, and the

11       anesthesia from the surgeries had an effect with

12       my memory.

13  Q.   When was your last surgery?

14  A.   My last surgery was -- I believe August.

15            THE COURT:  Of this --

16            THE WITNESS:  Of '07.

17            THE COURT:  Of '07.

18  BY MR. GREHER:

19  Q.   So you don't have any short-term memory loss at

20       this time; it is just the surgery at the time

21       affected your memory prior to that time?

22  A.   No, I have a memory problem period.

23  Q.   Okay, all right.  So when you got to the meeting

24       on May 30th, at 181 Church Street, were the

25       Fords already there?

1  A.  I believe so.

2  Q.  Okay, and in fact there were a lot of creditors

3      there, were there not?

4  A.  There were probably about four people there,

5      yes.

6  Q.  Okay, and were there other cases on before your

7      case was heard by the trustee?

8  A.  I believe so, yes.

9  Q.  Okay.  Was your case in fact the last case that

10     was heard that day, do you recall?

11 A.  I don't believe, so no.

12 Q.  All right.  In any event, there came a time when

13     you were questioned by the trustee, correct?

14 A.  Correct.

15 Q.  And then the trustee threw questioning open to

16     the creditors, is that correct?

17 A.  Correct.

18 Q.  And it was at that time that you were questioned

19     by Steve Ford and Kathie Ford and the other

20     creditors?

21 A.  I personally --

22         MR. PINSKY:  Objection, he

23     misstates the witness's testimony.

24 Q.  Well, were you questioned by Steve Ford?

25 A.  I personally don't believe I was questioned by

1        Steve Ford, no.

2    Q.    Were you questioned by Kathie Ford?

3    A.    No.

4    Q.    Okay, were you questioned by the other

5          creditors?

6              MR. PINSKY:  Objection, relevance.

7              THE COURT:  I would like to hear

8          the answer.

9    A.    No, all questions were directed to my attorney.

10             THE COURT:  Overruled, I would like

11         to hear the question.

12             MR. PINSKY:  Yes, ma'am.

13   BY MR. GREHER:

14   Q.    So all the questions were addressed to your

15         attorney?

16   A.    Correct.

17   Q.    So did Steve Ford address questions to your

18         attorney?

19   A.    Yes.

20   Q.    And did Kathie Ford address questions to your

21         attorney?

22   A.    Yes.

23   Q.    And was it your attorney who was answering those

24         questions, or was it you who was answering those

25         questions?

1   A.   It was my attorney who was answering those

2        questions.

3   Q.   Okay.  And then there came a time when the

4        meeting was over and you left, is that correct?

5   A.   Correct.

6   Q.   And then you stated that apparently something

7        happened; there was an altercation outside, is

8        that correct?

9   A.   That's correct.

10  Q.   Now, when you say outside, are you talking about

11       outside of the meeting room or outside of the

12       building?

13  A.   Outside of the building.

14  Q.   Okay.  And did this altercation, or whatever it

15       was that took place, did it take place in front

16       of the building or down the block from the

17       building?

18  A.   Right in front of the building.

19  Q.   Okay, and tell me again what happened, if you

20       recall?

21  A.   My sister, Sandra, and I had walked out of the

22       341 meeting, going outside the building, and

23       Kathie and Steve Ford were outside.  My sister

24       and I were continuing to walk down the stairs,

25       and Kathie Ford was yelling and screaming --

1   Q.   Okay, stop right there for a second.  Why was

2       she yelling and what was she screaming?

3   A.   The only thing that I recall is that she wanted

4       her money.

5   Q.   Okay, but she never lent you any money, correct?

6   A.   I'm sorry?

7   Q.   But she never had lent you any money?

8   A.   No.

9   Q.   And what happened at that point?  I think you

10      said your sister got in the middle?

11   A.   No, that's when Steven grabbed my arm, and my

12      sister --

13   Q.   Well, how did he grab your arm; what exactly did

14      he do?  Did he just grab your arm lightly and

15      say I want to talk to you?

16   A.   He just -- he grabbed my arm.

17   Q.   And what did he say?

18   A.   I want to talk to you.

19   Q.   Okay, was he screaming at you?

20   A.   I don't believe, so no.

21   Q.   Did he threaten you at any time verbally?

22   A.   Prior to grabbing me?

23   Q.   Yeah, did he make any verbal threats to you?

24   A.   No.

25   Q.   Did he use any profane language, curse at you,

1      anything like that?

2   A.  No.

3   Q.  He just grabbed your arm and said I would like

4       to talk to you?

5   A.  No, not I would like to talk to you, "I want to

6       talk to you."

7   Q.  Okay, "I want to talk to you"?

8   A.  Right.

9   Q.  Okay, and what happened then?

10  A.  That's when my sister, Sandra, got in the

11      middle.

12  Q.  And when you say she got in the middle, did she

13      physically get between you and he?

14  A.  She physically got in between.

15  Q.  And what happened then; what did she say or do,

16      if you recall?

17  A.  She told him to get his hands off of me.

18  Q.  And did he?

19  A.  Yes.

20  Q.  Okay, and then what happened?

21  A.  That's when I went inside -- well, Andrea had --

22      Malin had said to go inside.

23  Q.  Well, when did Andrea come out; do you have a

24      recollection of that, or did it happen so fast

25      you --

1   A.   It happened so fast.

2   Q.   Okay.  So but there came a time right after this

3        happened that you saw Andrea Malin, and she said

4        let's go back inside?

5   A.   She demanded for my sister and I to go back

6        inside.

7   Q.   Oh, well, what did she say exactly, do you

8        recall her words?

9   A.   "I want you guys inside now."

10  Q.   And you went?

11  A.   Yes.

12  Q.   And when you went inside, you obviously lost

13       sight of the Fords, correct?

14  A.   Correct.

15  Q.   Were there other creditors out on the street at

16       this time too, by the way, any of your other

17       creditors?

18  A.   No, not that I recall.

19  Q.   Okay, does that mean that they could have been

20       there and you don't remember?

21  A.   I don't think that they were out there, no.

22  Q.   So you came back inside; you lost sight of the

23       Fords, is that correct?

24  A.   Correct.

25  Q.   And when was the next time you saw the Fords?

1   A.   The next time I saw the Fords was when Kathie

2       was at my house.

3   Q.   So five months later?

4   A.   Correct.

5   Q.   You never saw Steve Ford again?

6   A.   No.

7   Q.   He didn't call you on the phone asking for

8       money?

9   A.   No.

10   Q.   Okay.  Now, you stated, I believe, that Miss

11       Malin told you to call the police?

12   A.   Yes.

13   Q.   And you did not call the police?

14   A.   I didn't, no.

15   Q.   Did you ever call the police?

16   A.   No.

17   Q.   Did you ever file a report with the District

18       Attorney's office?

19   A.   No.

20   Q.   Were you ever advised by Miss Malin to file a

21       complaint for assault or harassment with the

22       District Attorney's office?

23   A.   Yes.

24   Q.   When did she advise you of that?

25   A.   That same day.

1   Q.   Okay, but you didn't do so?

2   A.   No.

3   Q.   Any reason why?

4   A.   More personal reasons, I didn't want it to go

5        any further than what it had already gone.

6   Q.   You stated that Miss Malin asked the marshals to

7        come and escort you to the car, is that correct?

8   A.   Correct.

9   Q.   And that in fact happened?

10   A.   Yes.

11   Q.   How long after this incident, whatever happened,

12        did the marshals come?

13   A.   I think about maybe five minutes, ten minutes.

14   Q.   Okay, did you file any complaint with the

15        marshals, any type of report, anything of that

16        nature?

17   A.   I didn't, no.

18   Q.   Did you require any medical treatment?

19   A.   No.

20   Q.   Was there any bruising on your arm?

21   A.   No.

22   Q.   For what period of time, if you can tell us, was

23        Mr. Ford's hand on your arm?

24   A.   Ten seconds, if I had to guess.

25   Q.   Do you know how long ten seconds is?

1   A.   I know how long ten seconds is, yes.

2   Q.   And during this ten-second period was he saying

3        anything else to you, other than what you

4        previously testified he had said?

5   A.   That's all I -- yeah, that he wanted to talk to

6        me.

7   Q.   Okay.  Just that he wanted to talk to you?

8   A.   Um-hmm.

9   Q.   That's the only thing he said to you during this

10       whole time, "I want to talk to you."

11  A.   That I can remember, yes.

12  Q.   Well, okay, having said that, you had no idea,

13       really, as to what it is he wanted to talk to

14       you about, do you?

15  A.   No, I don't.

16  Q.   Okay.  Then the next time that we had any kind

17       of contact was five months later, to the second

18       incident that you testified to, correct?

19  A.   Correct.

20  Q.   And at that time you said that Mr. Helgerman was

21       in your house, correct?

22  A.   Correct.

23  Q.   Okay, was he living with you at that time?

24  A.   No.

25  Q.   Okay, what time of day was this?

1   A.   I believe it was around between 6:00 and 7:00.

2   Q.   At night?

3   A.   Yes.

4   Q.   And what was he doing there?

5   A.   He was there waiting for dinner to be done.

6   Q.   How often did he eat dinner at your house?

7   A.   Four nights a week.

8   Q.   I'm sorry?

9   A.   Four nights a week.

10   Q.   So you testified that you were in the kitchen
cooking dinner and somebody had come to the
door.  You heard -- was there a doorbell or a
knock?

14   A.   Yes, I heard the doorbell ring.

15   Q.   So you heard the doorbell.  So you're in the
kitchen.  Did you tell Mr. Helgerman to answer
the door?

18   A.   Yes.

19   Q.   Do you recall what your words were to him?

20   A.   "Answer the door."

21   Q.   Okay.  And the next thing you heard was
screaming?

23   A.   Yes.

24   Q.   Who was screaming?

25   A.   William was screaming.

1    Q.    Okay, and can you tell us what William was

2          saying?

3    A.    It was mumbled, I didn't hear -- I didn't hear

4          the words he was saying.  I was in the kitchen.

5    Q.    Okay, so as a result of you hearing the

6          screaming, is that what precipitated you moving

7          from the kitchen to the door to see what was

8          going on?

9    A.    Yes.

10   Q.    And at that time what did you see?

11   A.    I opened up the door and had seen Kathie.

12   Q.    And did you hear anything that Kathie was

13         saying?

14   A.    No, I didn't.

15   Q.    Okay, but there came a time when she told you

16         that it was none of your business, is that

17         correct?

18   A.    It was none of my business.

19   Q.    Right.  So did it appear to you that she was

20         involved in some type of a conversation with her

21         brother?

22   A.    Yes.

23   Q.    Okay.  How long did this conversation take?

24   A.    If I had to guess, five minutes.

25   Q.    And other than Kathie telling you it's none of

1       your business, did she say anything else to you?

2   A.   No.

3   Q.   And then you asked her to leave, correct?

4   A.   Correct.

5   Q.   And she left, right?

6   A.   Not when I asked her to leave, no.

7   Q.   Well, how long after you asked her to leave did

8       she leave?

9   A.   A few minutes later.

10  Q.   But all during that time she wasn't talking to

11      you, correct?

12  A.   No, she was talking to William.

13  Q.   Talking to William?

14  A.   Yes, about the money I owed her.

15  Q.   But she was not talking to you directly about

16      anything on that date, correct?

17  A.   No, she wouldn't talk to me.

18          MR. GREHER:  Okay, nothing further.

19      Thank you.

20          MR. PINSKY:  I have some redirect,

21      Your Honor.

22  REDIRECT EXAMINATION

23  BY MR. PINSKY:

24  Q.   Miss Westridge, you testified that Kathie Ford

25      on that day in October at your house was talking

1       to William Helgerman about money that you owed

2       her?

3   A.  Yes.

4   Q.  And what did you hear her say?

5   A.  The only thing that I heard was her saying that

6       she wanted her money.  That's all I remember.

7   Q.  And she was engaged in that conversation with

8       your boyfriend?

9   A.  Yes.

10  Q.  At your house?

11  A.  Yes.

12  Q.  In the evening?

13  A.  Correct.

14  Q.  Who else was in your house at the time?

15  A.  My daughter, my teenage daughter, and my

16      80-year-old grandmother.

17  Q.  All right, and did you fear for either your

18      safety --

19              MR. GREHER:  Objection.

20              MR. PINSKY:  This goes to damages,

21      Your Honor.

22              THE COURT:  I want to hear Mr.

23      Greher's objection first, Mr. Pinsky.

24              MR. GREHER:  Well, the objection

25      initially is on the grounds that he's

1      leading this witness.

2           THE COURT:  He's also outside the

3      scope of cross.

4           MR. GREHER:  Absolutely.

5           THE COURT:  I will sustain that

6      objection.

7  BY MR. PINSKY:

8  Q.  How long after you asked Miss Ford to leave was

9      it that she continued to talk with Mr.

10     Helgerman?

11  A.  I guess a few minutes.

12  Q.  And you said William was yelling?

13  A.  Yes.

14  Q.  What was the tone or volume level of Miss Ford's

15     voice?

16          MR. GREHER:  I'm going to object to

17     the form of the question.  I'm not sure I

18     understand it personally.

19          THE COURT:  I'm going to overrule

20     your objection.  I understood it.  I would

21     like to hear the witness answer it.

22  A.  I'm sorry, can you say that again?

23  BY MR. PINSKY:

24  Q.  Mr. Helgerman was yelling; what was Miss Ford

25     doing?

1  A.  She was yelling.

2          THE COURT:  That's not what you

3      asked.

4  Q.  How was the --

5          THE COURT:  What was the tone?

6  Q.  What was the tone or the volume of Miss Ford's

7      voice?

8          THE COURT:  That was the question.

9  A.  She was yelling also.

10 Q.  And how long had she been yelling?

11 A.  Again, a few minutes.

12 Q.  All right.  If you would please refer to the

13     last few pages of Exhibit 1.  As a matter of

14     fact, go to the very end of Exhibit 1.  Do you

15     recognize this document, Miss Westridge?

16 A.  This Schedule J?

17 Q.  Yes, ma'am.  Do you see the stamp up at the top?

18 A.  Yes.

19 Q.  All right, what does that say?

20 A.  Amended?

21 Q.  Did you submit an amended schedule in this case?

22 A.  I'm not understanding what you're asking.  This

23     is the 7 -- yes.

24 Q.  If you would, refer to Schedule F in the amended

25     schedule, and go to page seven of eight, and the

1      second entry on that page; do you see that

2      entry?

3  A.  Yes.

4  Q.  And what is the name of the creditor on that

5      entry?

6  A.  Steve Ford.

7  Q.  And what is the consideration stated for the

8      claim of Steven Ford?

9  A.  Corporate debt, no personal guaranty.

10  Q.  And is the claim listed as either contingent,

11      undisputed or liquidated?

12  A.  Unliquidated and disputed.

13  Q.  And what's the amount of the claim?

14  A.  One dollar.

15          MR. PINSKY:  I'll pass the witness,

16      Your Honor.

17  RECROSS-EXAMINATION

18  BY MR. GREHER:

19  Q.  If it was a corporate debt, why did you list him

20      on a personal bankruptcy?

21  A.  All of my personal and business were included in

22      this Chapter 7.  I didn't have a separate

23      personal and corporate.

24  Q.  But you understood that you were operating your

25      business as a corporation, is that correct?

1  A.  Correct.

2  Q.  So if somebody told you to put all of your

3      corporate debts in your personal bankruptcy --

4          MR. PINSKY:  Objection, privilege,

5      Your Honor.

6          THE COURT:  Sustained.

7  Q.  The yelling that you heard from the kitchen, was

8      that yelling on the part of both Mr. Helgerman

9      and Kathie Ford; were they both yelling?

10 A.  Yes, but I heard William.

11 Q.  And when you came out there, were you yelling as

12     well?

13 A.  No.

14 Q.  Did you raise your voice at all when you asked

15     Kathie to leave?

16 A.  Not at all.

17         MR. GREHER:  Nothing further, thank

18     you.

19         MR. PINSKY:  Your Honor, we would

20     call Andrea Malin as our next witness.

21         THE COURT:  You may step down.

22         THE WITNESS:  Thank you.

23

24         (Witness excused.)

25

```
1              THE COURT:  Would you get Miss
2        Malin, please.
3              MR. GREHER:  Judge, if I could --
4              THE COURT:  Take a break?  Go
5        ahead.  If you don't mind, while you're out
6        of the room, I'll just make sure Miss Malin
7        is sworn and give her name.
8              MR. GREHER:  That's fine.  Shall I
9        go get her?
10             THE COURT:  No, we'll send someone.
11       You go.
12             MR. PINSKY:  Your Honor, off the
13       record.
14             THE COURT:  Yes.
15
16             (Discussion off the record).
17
18             THE COURT:  Miss Malin, if you'll
19       take the witness stand, please.  And let the
20       record reflect I've been waiting to get Miss
21       Malin on the witness stand for a very long
22       time.  Miss Malin, you are under oath.
23       State your full name, please.
24             THE WITNESS:  It is Andrea B.
25       Malin.
```

1          THE COURT:  And your address,

2     please, Miss Malin.

3          THE WITNESS:  1136 Route 9,

4     Wappingers Falls, New York.

5          THE COURT:  And let me remind you

6     that you are under oath.

7          THE WITNESS:  Thank you.

8          THE COURT:  Mr. Pinsky, she's your

9     witness.

10         MR. PINSKY:  Yes, ma'am.

11

12         (ANDREA MALIN, having been duly

13     sworn, testified as follows:)

14

15   DIRECT EXAMINATION

16   BY MR. PINSKY:

17   Q.   Miss Malin, are you familiar with Ann-Marie

18     Westridge?

19   A.   Yes, I am.

20   Q.   And in what capacity are you familiar with her?

21   A.   My firm, Genova & Malin, was retained to first

22     file a Chapter 7 petition for Miss Westridge,

23     which was later converted to a Chapter 13, and

24     it was at that time I took over the case.

25   Q.   Very good.  And did you represent Miss Westridge

1       at the Section 341(a) creditors' meeting in the

2       Chapter 13 case?

3   A.  Yes, I did.

4   Q.  And at that meeting you were present at the

5       table with the trustee and the debtor and the

6       creditors?

7   A.  Yes, I was.

8   Q.  And can you tell the Court what transpired

9       during the meeting on that day?

10  A.  Yes.  Basically, I believe there were three

11      creditors there.  Myself and Ann-Marie sat at

12      the table across from Mr. Sapir, the Chapter 13

13      trustee.  Mr. Sapir took appearances by the

14      creditors, and of course the debtor and debtor's

15      attorney.  At that time I believe -- is it --

16      Mrs. Ford started to insist that she be paid the

17      debt she was owed.  She was getting louder and

18      louder.  I basically informed her that we were

19      there to discuss the petition, the schedules and

20      the schedules of assets and that she was free to

21      ask Miss Westridge any questions she had

22      regarding the assets or the income as set forth

23      on the petition.

24          Mr. Sapir then began to conduct the

25      meeting.  She again continued to insist that the

1           debt be paid; that Ann-Marie was a liar; that

2           there were assets that Ann-Marie did not

3           represent appropriately on the petition.

4                   Mr. Sapir reminded her that this was

5           to ask questions about the petition, and if she

6           wanted to, she could send Mr. Sapir a letter if

7           she thought she knew of any assets that were not

8           disclosed.

9                   After that, firmly, I had to continue

10          to remind her that this was a 341 exam that

11          needed to go forward, that questions needed to

12          be asked, that maybe she should consult with an

13          attorney and do a 2004 examination.  Mr. Sapir

14          advised her of that as well.  And then we

15          finally got through the meeting, and Mr. Sapir

16          closed it.

17    Q.    Very good.  And how would you characterize the

18          interaction between you and Miss Ford at that

19          meeting at the table?

20    A.    She was -- she was -- she was visibly upset.  I

21          was again firm, because we needed to continue to

22          conduct the meeting.  There were a great many

23          people already in the room, and there were other

24          cases that needed to go forward.  And Mr. Sapir

25          finally took control of the meeting and quieted

1        it down so that we could get through it, but it

2        was agitated.

3   Q.   Do you recall the events that followed the

4        closure of that meeting on that day?  What was

5        the next thing that you became aware of

6        involving the debtor on that day when the 341

7        meeting was held?

8   A.   I asked the debtor to sit in the 341 room and

9        not leave until the creditors left.  They

10       left -- because it was very heated.  They left,

11       so Ann-Marie and her sister, who was with her, I

12       told them I believed it was safe for them to

13       leave, and they did leave.

14            The next thing I heard -- because I

15       stayed in the room, I had other 341 meetings

16       on -- was a great deal of screaming outside.  I

17       and several other attorneys heard it, and we

18       went to the door to see what was going on.  When

19       I came to the door what I saw was -- it was the

20       old 341 room, so that cement porch, I was on the

21       cement porch at the door.  I looked down on the

22       sidewalk right in front of the cement porch.

23       Ann-Marie was facing this way -- sorry, I don't

24       know if that's east or west, but towards the

25       courthouse.

```
 1                    THE COURT:  West.
 2    A.    Oh, west.  Mr. Ford had ahold of her right arm,
 3          and he was --
 4    Q.    Let the record reflect the witness is holding
 5          her right biceps.
 6    A.    He was screaming at her, and her sister was
 7          standing in between Ann-Marie and him spread
 8          with her arms full out and her legs full out as
 9          if she was trying to keep him from attacking
10          her.  And he was --
11                    MR. GREHER:  Objection.  It is
12          purely a conclusion on the part of this
13          witness.
14                    THE COURT:  I will have to sustain
15          the objection on the attempting to protect.
16          She can describe -- the witness can describe
17          what she saw.  She can't characterize what
18          it was.
19                    MR. PINSKY:  Yes, ma'am.
20    A.    I apologize.  So I told Mr. Ford that he had to
21          let her go, and he had to leave or I would call
22          the police.  Mr. Ford told me that he just
23          wanted to talk to her because he wanted his debt
24          to be paid, and he wanted to work it out with
25          the debtor.  I told him that he did not have the
```

1    right to insist that he be paid.  He had rights

2    in the Chapter 13.  He had to leave and he had

3    to take his hands off of her.  And I told both

4    Ann-Marie, the debtor, and her sister to come

5    back into the Court -- into the 341 room.  Which

6    they did come back into the 341 room.  As they

7    were coming back into the 341 room, Mr. Ford

8    stated he did not care, he would continue this

9    discussion with her and wait for her at her car

10   in the parking lot, her being the debtor.

11           At that point, once they were safely

12   in the building, I went to the marshals, and I

13   asked the marshals if we could have someone come

14   over and walk Miss Ann-Marie and her sister to

15   the parking lot so they could safely get in

16   their car.

17           Ann-Marie at that point was crying.

18   She was tremendously upset.  Her sister was very

19   upset.

20           MR. GREHER:  Objection as to

21   conclusion.  Once again, it is a

22   characterization.

23           THE COURT:  Sustained.

24           MR. PINSKY:  The witness can

25   testify as to what she observed.

     1                   THE COURT:  She observed her being

     2          upset.

     3   A.    Correct.

     4                   THE COURT:  And then your objection

     5          to what else?

     6                   MR. GREHER:  Well, I think we need

     7          to --

     8                   THE COURT:  She's crying and she's

     9          upset; we heard that.  What else?

    10                   MR. GREHER:  Nothing, Judge.

    11                   THE COURT:  Okay.

    12   A.    One of the marshals did agree to come over and

    13          did in fact walk Ann-Marie and her sister to the

    14          car.

    15   Q.    Yes, ma'am.  When you came out of the building

    16          at 181 Church Street and stepped into this

    17          event, did you have an opportunity to observe

    18          anything that Kathie Ford was doing or saying?

    19   A.    Kathie Ford was standing behind Steven Ford, and

    20          she was screaming that she was going to be paid,

    21          that Ann-Marie ripped her off, and all sorts of

    22          vulgarities.  But it was so intense that I did

    23          not hear exactly what she said.

    24                   THE COURT:  The Court would like

    25          for you to -- okay, the Court wants you to

1      be specific.

2                THE WITNESS:  Well, I know she was

3         screaming at her that she was going to be

4         fucking paid, and that Ann-Marie was a

5         bitch.

6    Q.   All right, and following that series of events

7         that you just described, did you have the

8         occasion, sometime in May, June, July, to file a

9         motion for sanctions?

10   A.   Yes, I did.

11   Q.   And do you recall the date of that motion?

12   A.   I want to say I recall --

13   Q.   Withdraw the question.

14   A.   Okay, probably November.

15   Q.   Miss Malin, in connection with the motion for

16        sanctions that you prepared, did you incur fees

17        for the time that you spent and costs for any

18        disbursements that your firm may have incurred?

19   A.   Yes, I did.

20   Q.   And did you prepare time records with respect to

21        those fees and expenses?

22   A.   Yes, I did.

23                MR. PINSKY:  Your Honor, may I

24        approach the witness?

25                THE COURT:  Certainly.

1  Q.  I'm handing you what's been marked as Exhibit 5.

2      Do you recognize that document?

3  A.  Yes, I do.

4  Q.  And what is it?

5  A.  It's the time sheets that I kept in regard to

6      the case.

7  Q.  And those time entries, are those

8      contemporaneous entries of time that you spent

9      working on the motion for sanctions and its

10     prosecution?

11 A.  Yes.

12 Q.  And is that a true and correct copy of those

13     time entries?

14 A.  Yes, it is.

15 Q.  Are there disbursements reflected in that

16     document as well as fees for time spent?

17 A.  Yes, there are.

18 Q.  Is that a true and accurate copy of

19     contemporaneous entries of disbursements by you

20     or someone at your firm in this matter?

21 A.  Yes, that is.

22          MR. PINSKY:  I move the

23     introduction of Exhibit 5, Your Honor.

24          THE COURT:  Any objection?

25          MR. GREHER:  Well, Judge, as long

1       as I have an opportunity at some point to

2       either cross-examine Miss Malin with respect

3       to the items or submit opposition to it, I

4       would have no objection.

5            THE COURT:  We will wait until such

6       time as you can do that to either allow or

7       disallow.

8            MR. GREHER:  Okay.

9            MR. PINSKY:  Very good, Your Honor.

10           THE COURT:  Just don't let me

11      forget it.

12           MR. PINSKY:  Your Honor, may I

13      approach the witness again?

14           THE COURT:  Yes.

15  Q.  Miss Malin, I hand you what's been marked for

16      identification as Exhibit 2 and ask you if you

17      recognize that document?

18  A.  Yes, I do.

19  Q.  And what is it?

20  A.  This is the motion that the firm filed on behalf

21      of Miss Westridge under 362.

22  Q.  And the 362 were --

23  A.  Oh, I'm sorry, I'm sorry, the motion objecting

24      to claims under 502.

25  Q.  And is Mr. Ford's claim included in that

1      objection to claims?

2   A.  Yes, it is, claim 9.

3   Q.  And what is the basis for the objection to Mr.

4       Ford's claim?

5   A.  The basis for the objection to Mr. Ford's claim

6       is that Mr. Ford was not in fact owed a debt.

7       And if he were owed a debt, it would have been a

8       debt between Mr. Ford and a corporation that was

9       owned by Miss Westridge, part of the filing.

10  Q.  Was a hearing ever held on that motion with

11      respect to the Ford claim specifically?

12  A.  Yes, there were several hearings held on this,

13      because it was also --

14              MR. GREHER:  Objection at this

15      time.  Judge, I'm going to object to the

16      line of questioning on the grounds of

17      relevance to this particular proceeding.

18              THE COURT:  I'm going to overrule

19      it, unless you can tell me something besides

20      relevance.

21              MR. GREHER:  Well, Judge, I think

22      relevance is everything that you need to

23      know with respect to this.  The motion is

24      for sanctions based upon two specific

25      instances.  We are going beyond that motion

1        at this point in time, introducing testimony

2        that has nothing to do with the issues that

3        you have to determine today.

4               MR. PINSKY:  May I respond, please?

5               THE COURT:  Yes, please.  No,

6        respond to me, not her.

7               MR. PINSKY:  Yes, Your Honor.  The

8        objection to claim recites grounds which

9        demonstrate the extent to which the Fords

10       were attempting to go to collect money that

11       this debtor didn't even legally owe them.

12       Notwithstanding the fact that it was

13       originally scheduled as a personal

14       obligation as part of debtor's Exhibit 1,

15       there is an amended schedule wherein the

16       Ford claim is clearly listed as a corporate

17       disputed contingent debt.  The debtor had to

18       file a motion and go through a series of

19       preliminary hearings in front of this Court

20       before Mr. Ford withdrew his motion, rather

21       than actually go to an evidentiary hearing.

22       And it is relevant because --

23               THE COURT:  I'm going to allow it.

24               MR. GREHER:  Okay, note my

25       exception.

1           THE COURT:  Thank you.

2    BY MR. PINSKY:

3    Q.   And Miss Malin, do you recall whether or not the

4         Ford claim was withdrawn?

5    A.   Yes, I was told that it was withdrawn by Mr.

6         Greher.  That after --

7              MR. GREHER:  Objection, calls for a

8         simple yes or no answer, Judge.

9              THE COURT:  It does.  Answer the

10        question.

11   A.   Yes, it was withdrawn.

12   Q.   And when was it withdrawn; under what

13        circumstances was it withdrawn?

14   A.   It was --

15             MR. GREHER:  Well, Judge, at this

16        point in time I would like to make an

17        objection as well.  Now we are talking about

18        attorney/client privilege on the other side.

19             THE COURT:  I think so too.  It is

20        withdrawn.  We now know it's withdrawn.  We

21        know who went through the effort to do it.

22             MR. PINSKY:  Yes, ma'am.

23             THE COURT:  And it was withdrawn.

24             MR. PINSKY:  And actually, if you

25        would allow me to connect up.

1            THE COURT:  Well, you ask me the

2    question, and then we can see if Mr. Greher

3    will object.

4            MR. PINSKY:  Very good, Your Honor.

5            And the question would be:  Was the

6    claim withdrawn immediately prior to a fully

7    briefed hearing, evidentiary hearing on the

8    Ford claim?

9            MR. GREHER:  I would object to that

10   question.  It also goes to attorney/client

11   privilege.

12           And furthermore, Your Honor, Miss

13   Malin -- we really don't need you shaking

14   your head.  We are going to reach a point,

15   if we continue this line of questioning,

16   where I'm going to have to ask for an

17   adjournment, because then you're going to be

18   forcing me to testify in this proceeding,

19   because absent that we are going to get into

20   areas of speculation.

21           THE COURT:  I think what we have on

22   the record -- I can take judicial notice of

23   when the things were filed and when the

24   claim was withdrawn.

25           MR. PINSKY:  Very good, Your Honor.

1           THE COURT:  Because it's on the

2      record.

3           MR. PINSKY:  And we'd respectfully

4      ask the Court to take judicial notice of the

5      briefing.

6           THE COURT:  That's sufficient.

7           MR. PINSKY:  Thank you.

8   BY MR. PINSKY:

9   Q.   What is your hourly billing rate?

10  A.   My hourly billing rate at the firm is $275.

11  Q.   $275.  And how many hours have you spent so far

12       today in addition to the time reflected in your

13       time records at this hearing?

14  A.   I've been here since 9:30 this morning, and I

15       spent approximately 45 minutes reviewing the

16       file last night.

17           MR. PINSKY:  Very good.  Thank you.

18       Pass the witness, Your Honor.

19           THE COURT:  Okay, Mr. Greher.

20   CROSS-EXAMINATION

21   BY MR. GREHER:

22  Q.   Well, you're here as a witness today, is that

23       correct?

24  A.   Yes, I am.

25  Q.   And your intention -- was it your understanding

1       that your time could be billed to somebody with

2       respect to your appearances today?

3  A.   I had no understanding of any billing, and I

4       have not created a bill for this time today.

5  Q.   Have you been paid any monies for the work you

6       have done to date on the sanctions motion?

7  A.   No.

8  Q.   Now, the 341 meeting that you attended with the

9       debtor, that was taped, was it not?

10  A.   That was -- I'm sorry?

11  Q.   It was on tape, it was a taped meeting?

12  A.   I believe it would have been.

13  Q.   Did you ever subpoena the tape?

14  A.   I did not.

15  Q.   Did you ever hear the tape?

16  A.   I did not.

17  Q.   Okay.  Did you ever advise your client to file

18       any criminal charges as a result of what you

19       observed or what you were told happened?

20  A.   I did say to Mr. Ford that I would call the

21       police, yes.

22  Q.   Okay, did you call the police?

23  A.   No, I didn't, because the guards came over and

24       helped me.

25  Q.   Did you file any charges with the District

1           Attorney's office?

2    A.     No.

3    Q.     Did you recommend or suggest that Miss Westridge

4           file any such charges?

5    A.     I recommended to Miss Westridge, after she told

6           me about the altercation at the house, at her

7           personal residence, that if it were to occur

8           again she should call the police immediately, so

9           that she could be protected, because she had a

10          minor child there.  And also that it might be

11          something she would want to determine whether or

12          not she needed a restraining order --

13   Q.     Is that a yes or no to the question?

14   A.     Well, I don't know what you mean, accept legal

15          charges.  If you'd like to ask me --

16                THE COURT:  Miss Malin, please do

17          not argue with the attorney.

18                THE WITNESS:  I'm sorry.

19   Q.     Do you have any personal knowledge of what may

20          or may not have taken place at Miss Westridge's

21          house in October of 2007?

22   A.     No.

23   Q.     Now, do you happen to recall whether or not the

24          Fords were already in the 341 room at the time

25          Miss Westridge arrived at that 341 meeting?

1  A.  I believe they were, because Miss Westridge told

2      me that they were there.

3  Q.  Okay, and were there other creditors there as

4      well?

5  A.  Yeah.

6  Q.  Other creditors in the Westridge matter there?

7  A.  Yeah, there was one other.  I believe he was in

8      a wheelchair.

9  Q.  Now, at the end of Mr. Sapir's questioning of

10      Miss Westridge, did he ask whether or not any

11      creditors had any questions?

12  A.  Yes, he did.

13  Q.  And at that time did either Mr. or Mrs. Ford ask

14      any questions?

15  A.  Mr. Ford did not talk at the 341 meeting, as I

16      recall.

17  Q.  Okay, what about Mrs. Ford?

18  A.  Mrs. Ford asked questions more towards when she

19      could expect to collect the debt, as I recall,

20      not specific questions as to the schedules.

21      Except I do believe she might have advised Mr.

22      Sapir that she believed the house was not -- the

23      value of the house on the petition did not

24      reflect what she believed the value to be.

25  Q.  Okay.  And before the case was converted to

1       Chapter 13, the matter was handled by your

2       partner, was it not?

3   A.  Yes, Mr. Genova.

4   Q.  Oh, so you had no contact with the file until

5       such time as it was converted to Chapter 13, is

6       that correct?

7   A.  No.  I had contact with the file after the

8       initial 341 in the 7.

9   Q.  Okay.  Did you have any meetings -- I'm not

10      going to ask you what was said, but did you have

11      any meetings with Miss Westridge before the 341

12      meeting?

13  A.  Before the Chapter 7 341 or before --

14  Q.  Before the Chapter 13 341 meeting?

15  A.  I had meetings with her, yes.

16  Q.  And you had opportunities and occasions to

17      review the files, correct?

18  A.  Yes.

19  Q.  And in your review of the files and in your

20      conversations with Miss Westridge did you have

21      any understanding as to whether or not Kathie

22      Ford was a creditor of Miss Westridge?

23          MR. PINSKY:  Objection --

24          THE COURT:  Sustained.

25          MR. PINSKY:  -- on the basis of

1       privileged communications.

2               THE COURT:  Sustained.  The record

3       is the record on that.  We've got a filing.

4               MR. GREHER:  Okay.

5   BY MR. GREHER:

6   Q.  Now, the questions that were asked at the 341

7       meeting by Miss Ford, were they directed to you,

8       were they directed to your client, or were they

9       directed to Mr. Sapir, if you recall?

10              MR. PINSKY:  Objection.  I believe

11      it mischaracterizes the witness's testimony.

12      I believe she testified that there weren't

13      questions; they were statements.

14  Q.  Were there any questions -- was the questions --

15              THE COURT:  Were there any

16      questions from Miss Ford?

17  A.  The only questions that I recall is when was she

18      going to be paid.

19  Q.  Okay, and to whom was that question directed?

20  A.  I don't know if it was directed to anybody in

21      general, but she was just stating it.

22  Q.  Okay.  Now, I believe you testified that after

23      the meeting you asked your client to stay for a

24      minute or two to let the creditors leave?

25  A.  Yes.

1   Q.   And was it at that point, or shortly thereafter,

2        that she in fact left?

3   A.   Yes.

4   Q.   Okay.  And how long after she left the room did

5        you hear what you've characterized as some type

6        of a commotion?

7   A.   I would have to say a couple of minutes.

8   Q.   Okay.  So she left the room.  There was no noise

9        for a couple of minutes, and then you heard

10       whatever it is you heard?

11  A.   Well, I'll have to just tell you, I sat in the

12       front row, because I had several 341s on, and I

13       always sit in the front row.  Miss Westridge sat

14       behind me.  So the exact amount of time it took

15       her to actually calm down and leave I don't

16       know.  But I know from the time I sat down, it

17       was a couple of minutes before I heard the

18       screaming.

19  Q.   Then you went outside and you stood on the

20       stoop, on the steps?

21  A.   Yeah, I didn't go down, I opened up the door and

22       stood in the doorway on the stoop.

23  Q.   Okay.  Incidentally, is there a parking lot in

24       front of that courthouse, in front of the

25       meeting room?

 1   A.   Planned Parenthood's parking lot.

 2   Q.   Okay.

 3   A.   And there's also the other parking lot.

 4   Q.   The municipal lot on the corner, correct?

 5   A.   Yes.

 6   Q.   As you come out the door and you make a left

 7        turn, there's a municipal lot on the corner of

 8        Academy and Church, correct?

 9   A.   Correct, there's also one in the plumber

10        business, which is right next to the Planned

11        Parenthood.

12   Q.   Right, and there's a parking lot in back of the

13        341 room?

14   A.   That is correct.

15   Q.   And there's a further parking lot across Cannon

16        Street, a municipal lot, correct?

17   A.   That is correct.

18   Q.   You had no idea where your client had parked,

19        did you?

20   A.   She parked in the Academy Street parking lot.

21   Q.   And how do you know that?

22   A.   Because she told me.

23   Q.   When did she tell you that?

24   A.   We had discussed where to park prior to the

25        hearing, because we needed to make sure that our

1    cars weren't getting towed and booted and that

2    kind of thing, as they were behind the building.

3  Q.  Okay.  Now, in furtherance of this sanctions

4    motion you submitted an affidavit, did you not?

5  A.  I believe I did, yes -- or I believe it was an

6    affirmation.

7  Q.  Okay.  In that affirmation did you set forth the

8    language that you testified to here in Court

9    today, fucking bitch, things of that nature, was

10    that in your application?

11        THE COURT:  Mr. Pinsky has the --

12        MR. PINSKY:  Your Honor, that

13    document is available to counsel.  It's not

14    on the exhibit list.  If it would help Miss

15    Malin refresh her recollection, a copy can

16    be provided to her.

17        MR. GREHER:  I have no objection --

18        THE COURT:  With a copy being

19    provided.

20        MR. GREHER:  With letting -- if he

21    wants to let his witness refresh her

22    recollection.

23        MR. PINSKY:  May I approach the

24    witness, Your Honor?

25  A.  I've reviewed it.

1   BY MR. GREHER:

2   Q.   I'm sorry?

3   A.   I've reviewed it.  The question is I did not put

4        in here the term fucking nor did I put in the

5        term bitch.

6   Q.   Okay.  There came a point in time during this

7        incident out on the sidewalk that you asked your

8        client to come back inside?

9   A.   Yes.

10  Q.   Okay.  And how long a period of time were you

11       out there observing whatever it was that you

12       observed?

13  A.   A couple of minutes.

14  Q.   And for what period of time did you observe Mr.

15       Ford have his hand on your client's arm?

16  A.   I would say that was probably a minute.

17  Q.   So for a minute he was holding onto her?

18  A.   Yeah.

19  Q.   And what was she doing during that minute?

20  A.   She was crying and had her head bowed down

21       because he was screaming in her face.

22  Q.   Did she try to remove the hand?

23  A.   Not that I saw.

24  Q.   And in any event, you did not interpose yourself

25       physically into whatever it was that was taking

1     place?

2  A.  Absolutely not.

3  Q.  Okay.  And there came a point in time that you

4     contacted the marshals, is that correct?

5  A.  Correct.

6  Q.  Now, were they in the building at the time, or

7     did you have to go across the street?

8  A.  I had to go across the street.

9  Q.  And when you went across the street, where were

10    Mr. and Mrs. Ford?

11  A.  I believe that they had -- when I actually went

12    across the street, they were walking on the

13    sidewalk in front of the 341 room.

14  Q.  Okay.  And when the marshals came back, were the

15    Fords still there?

16  A.  I did not witness them there, no.

17        MR. GREHER:  Okay, I have nothing

18    further, thank you.

19        THE COURT:  Any redirect?

20        MR. PINSKY:  None.  We would,

21    however, move the introduction of Exhibit 2

22    at this time.

23        MR. GREHER:  Well, I previously

24    raised an objection to it, and I think you

25    already ruled on it.

1          THE COURT:  Basically I've ruled on

2     it.  It is judicial notice.  It's on the

3     docket.

4          MR. PINSKY:  Very good, Your Honor,

5     I just -- I hadn't moved it into evidence.

6          THE COURT:  And the withdrawal, I

7     will take judicial notice of it.

8          You may be excused.

9          THE WITNESS:  Thank you, Your

10    Honor.

11         THE COURT:  Even though I didn't

12    get to ask the questions I needed to ask.

13         THE WITNESS:  Should I leave those

14    there?

15         THE COURT:  If you'll hand those

16    back to Mr. Pinsky, please.

17

18         (Witness excused.)

19

20         THE COURT:  Who do you the want

21    next, Mr. Pinsky?

22         MR. PINSKY:  Your Honor, I would

23    call Sandra Raymond next.

24         THE COURT:  Miss Malin, do you mind

25    asking Miss Raymond to come in, please.

1               MS. MALIN:  Sure.

2               THE COURT:  And Miss Malin is

3       excused either to go or to stay in the

4       courtroom.

5               MR. GREHER:  I have no problems

6       either way, Judge.

7               THE COURT:  Miss Malin, your

8       choice.

9               MR. GREHER:  As long as we are not

10      being charged for her sitting here.

11              THE COURT:  I don't think she'll

12      charge you for her time sitting here.

13              If you'll please come around.  Let

14      me remind you that you're under oath.  And

15      if you will tell us your full name.

16              THE WITNESS:  Sandra Raymond.

17              THE COURT:  And your address,

18      please.

19              THE WITNESS:  P.O. Box 165,

20      Johnson, New York 10933.

21              THE COURT:  It's that microphone I

22      need you speak into.  And you can sit down.

23      Would you please spell your last name.

24              THE WITNESS:  R-A-Y-M-O-N-D.

25

```
 1              (SANDRA RAYMOND, previously duly

 2         sworn, testified as follows:)

 3    DIRECT EXAMINATION

 4    BY MR. PINSKY:

 5    Q.   Miss Raymond, are you familiar with the debtor

 6         Ann-Marie Westridge?

 7    A.   Yes, I am.  That's my sister.

 8    Q.   Very good.  And you're aware that she's in a

 9         bankruptcy case?

10    A.   Yes, I am.

11    Q.   And did you attend any meetings in the

12         bankruptcy case with her?

13    A.   Yes, I did.

14    Q.   And what meeting did you attend, as far as --

15    A.   Her creditors' meeting.

16    Q.   Creditors' meeting.  And who was present at that

17         creditors' meeting, if you recall?

18    A.   A whole table full of people, including Kathie

19         and Steve.

20    Q.   Kathie and Steve Ford?

21    A.   Yes.

22    Q.   And when the meeting was over with, what did you

23         do?

24    A.   We left -- tried to leave.

25    Q.   Who is we?
```

1   A.   Myself and my sister, Ann-Marie Westridge.

2   Q.   Please tell us what happened.  You got up and

3        what?

4   A.   We was walking out the door of the courthouse

5        where we was at, and we was coming down the

6        stairs.  Kathie was yelling that she wanted her

7        money -- word from word was "I want my fucking

8        money," and she kept yelling and yelling.

9        Steve -- I said to Ann-Marie, c'mon, just keep

10       walking.  We tried to keep walking.  Steve was

11       to the right of Ann-Marie, grabbed her arm.

12  Q.   And let the record reflect the witness grabbed

13       her biceps.  So please continue?

14  A.   Yes, it was actually her right arm, because he

15       was on the right-hand side of her.  I was on the

16       left-hand side.  Kathie was above me on a step,

17       yelling down.  We kept walking.  When Steve

18       grabbed Ann-Marie, he said that they wanted to

19       talk to her.  Andrea and half the courthouse

20       came out to find out what all the yelling was

21       about.  Andrea asked us to come back inside.  I

22       had taken my arm to try and get Steve's hand off

23       my sister's biceps, and Andrea was asking us to

24       come in.  We went back inside where there was a

25       comment made that they would be waiting out in

1    the parking lot when we came out.  That's when

2    Andrea asked the bailiff, whoever was there, to

3    walk us, escort us out to the car.

4         Honestly, it probably seemed like an

5    hour -- it was probably only a few minutes.  It

6    seemed like forever.  And we waited inside and

7    we went out to the parking lot; no one was

8    there, so we left.

9  Q.  Did you have an opportunity to observe Miss

10   Westridge while this was happening?

11 A.  She was upset.

12 Q.  And what did you observe, what did you see?

13 A.  Umm, other than her being upset, you know,

14   crying, that was about it.

15        MR. PINSKY:  I pass the witness.

16   Thank you, Your Honor.

17        THE COURT:  Mr. Greher.

18        MR. GREHER:  Thank you, Your Honor.

19  CROSS-EXAMINATION

20  BY MR. GREHER:

21 Q.  Did you know Steve and Kathie Ford prior to the

22   day you went to Bankruptcy Court?

23 A.  I don't know them personally.  I know of them.

24   I know from seeing them, but that's -- again, I

25   don't know them personally, no.

1  Q.  Now, were you there that day for moral support;

2      why were you there?

3  A.  I was there because actually I was one of the

4      creditors as well.

5  Q.  And did you in fact -- did you drive your sister

6      there, or did she drive you there, did you come

7      separately?

8  A.  No, I drove her there, because the last meeting

9      I didn't attend to she was attacked verbally --

10  Q.  By who?

11  A.  -- that's why --

12  Q.  By who?

13  A.  Steve and Kathie and everybody else that they

14      had brought that day.

15  Q.  Well, you weren't there, so you don't know what

16      happened?

17  A.  And that's why I said I don't know exactly --

18          THE COURT:  You asked the question,

19      Mr. Greher.  You got an answer.

20          MR. GREHER:  Okay.

21  Q.  Well, you weren't there that day at the first

22      meeting, right?

23  A.  No, I was not.

24  Q.  So you don't know what happened there that day,

25      right?

1    A.   No, but I was there the second day, because --

2    Q.   All right, that's not the question.

3    A.   Okay.

4    Q.   So you drove your sister that day, right?

5    A.   Yes, I did.

6    Q.   And where did you park --

7              THE COURT:  You opened the door,

8         Mr. Greher.

9    Q.   Where did you park?

10   A.   I parked in the municipal building parking lot

11        that was about a hundred feet from the building.

12   Q.   And were there -- did you happen to observe how

13        many parking lots there were in the area?

14             MR. PINSKY:  Objection, relevance.

15   A.   No, actually, I didn't.  That's the first time I

16        was in Poughkeepsie.

17             THE COURT:  When this man stands

18        up, you don't talk until I say so.

19             THE WITNESS:  Okay.

20             THE COURT:  Sustained.

21   BY MR. GREHER:

22   Q.   Now, when you went outside after the meeting,

23        you said Kathie was on the step, is that

24        correct; were you past her already at that

25        point; were you already on the sidewalk?

1    A.   We was coming down the steps.

2    Q.   When you claim that Steve grabbed your sister,

3         was she on the steps at that time, or was she on

4         the sidewalk at that time?

5    A.   We was down on the sidewalk at that time.

6    Q.   And was Steve on the sidewalk at that time?

7    A.   Yes, he was.

8    Q.   And Kathie was behind you on the stairs?

9    A.   Yes.

10   Q.   They weren't together?

11   A.   No.

12   Q.   And for what period of time did you observe

13        Steve have his hand on your sister's arm?

14   A.   Again, like I said before, it seemed like a long

15        time.  Honestly, I don't know.  It seemed like a

16        long time.  I don't know.

17   Q.   Could it have been a second or two?

18   A.   It could have been 30 minutes.

19              MR. PINSKY:  Objection, calls for

20        speculation.

21   A.   It felt like it.

22              THE COURT:  Remember, when that man

23        stands, you don't answer.

24              THE WITNESS:  Okay, I'm sorry.

25              THE COURT:  Mr. Greher, I will

1          sustain the objection on that because she's

2          already testified.

3                    MR. GREHER:  Thank you, Judge.

4     BY MR. GREHER:

5     Q.   Now, did you engage in any conversation with

6          Kathie Ford at that time?

7     A.   No, I did not.

8     Q.   Were you screaming or saying anything to anybody

9          at that time?

10    A.   No, the only thing I was telling my sister was

11         let's go.

12    Q.   Okay, so the only words that came out of your

13         mouth during this whole incident was let's go?

14    A.   Yes.

15    Q.   And did you observe any conversations between

16         Steve and your sister?

17    A.   When he was grabbing her, he was like -- we want

18         to talk to you, and Kathie was yelling,

19         that's --

20    Q.   Other than we want to talk to you or I want to

21         talk to you, did Steve say anything?

22    A.   Not that I can recall.  Like I said, the only

23         thing I kept hearing was yelling from Kathie,

24         and --

25    Q.   Why was she yelling?

1    A.   Because she wanted --

2    Q.   What was she yelling, do you know the words, do

3         you remember the words?

4    A.   The words were "I want my fucking money."

5         That's what she kept saying is "I want my

6         fucking money."  Steve grabbed her and --

7              THE COURT:  You stood up.

8              THE WITNESS:  I feel like a puppet

9         here.

10             MR. PINSKY:  Please continue, go

11        ahead.  The witness is entitled to answer

12        the question.  That's why I stood up.  You

13        can continue your answer.  Do you

14        remember --

15             THE WITNESS:  What was the

16        question?

17             MR. GREHER:  I'll go on. It doesn't

18        matter.

19             THE COURT:  We heard what she had

20        to say.

21   BY MR. GREHER:

22   Q.   Were there any other people on the sidewalk at

23        that time, other than you and your sister and

24        Steve and Kathie Ford?

25   A.   There was a lot of people when the yelling --

1      when Andrea came out, all the courthouse came

2      out.

3  Q.  Before that, were there any other creditors out

4      on the street at this time?

5  A.  No.

6          MR. GREHER:  Okay, nothing further.

7      Thank you.

8          THE COURT:  Any redirect?

9          MR. PINSKY:  No, Your Honor.

10         THE COURT:  Very good.  May we

11     excuse this witness, or the witness can stay

12     in the courtroom?

13         MR. GREHER:  I would like her

14     excused.

15         THE COURT:  Okay.

16         MR. PINSKY:  If you could step

17     down, Miss Raymond, and wait outside.  Thank

18     you very much.

19

20         (Witness excused.)

21

22         MR. PINSKY:  And, Your Honor, we

23     would call William Helgerman next.

24         THE COURT:  Do you know who he is?

25         THE WITNESS:  Yes, I do.

1          THE COURT:  Would you please ask

2     him to come in?

3          THE WITNESS:  I will.

4          THE COURT:  Thank you.

5          Mr. Greher, do you need a break?

6          MR. GREHER:  I'm fine.  Thank you,

7     Judge.

8          THE COURT:  The Court will take a

9     break at 12:30.

10          This is your last witness, Mr.

11     Pinsky?

12          MR. PINSKY:  Yes, it is, Your

13     Honor.

14          THE COURT:  Come in, sir, and if

15     you'll come to the witness stand, please.

16          Mr. Greher, let me ask you a

17     question.  He's also your witness.

18          MR. GREHER:  Well, I put him on the

19     list, because I wasn't sure that he was

20     going to be here.

21          THE COURT:  Okay, because I was

22     wanting to know what we were going to do --

23     you can just sit down right here.  I just

24     wanted to know what we wanted to do about

25     that, because what we might have done is

```
 1        then gone into your direct of him.  But if

 2        you're just going to do cross, that's fine.

 3                  MR. GREHER:  Exactly.

 4                  THE COURT:  Okay, that's fine then.

 5                  Let me remind you you're under

 6        oath.

 7                  THE WITNESS:  Um-hmm.

 8                  THE COURT:  State your full name.

 9                  THE WITNESS:  William M. Helgerman.

10                  THE COURT:  And Mr. Helgerman,

11        what's your address, please?

12                  THE WITNESS:  It is P.O. Box 126.

13                  THE COURT:  I need a street

14        address.

15                  THE WITNESS:  Route 6, Greenville,

16        New York.

17                  THE COURT:  And zip code there?

18                  THE WITNESS:  I have no clue.

19                  THE COURT:  Do you get your mail at

20        that address?

21                  THE WITNESS:  No, I get my mail at

22        the P.O. box.

23                  THE COURT:  Now then give us the

24        P.O. box too.

25                  THE WITNESS:  P.O. Box 126,
```

1        Westown, New York 10998.

2                 THE COURT:  Very good.  He's your

3        witness.

4                 MR. PINSKY:  Thank you, Judge.

5

6                 (WILLIAM H. HELGERMAN, having been

7        previously duly sworn, testified as

8        follows:)

9

10   DIRECT EXAMINATION

11   BY MR. PINSKY:

12   Q.   Mr. Helgerman, are you familiar with Ann-Marie

13        Westridge?

14   A.   Yes.

15                 THE COURT:  You can take your

16        shades off your head, please.

17   Q.   And how is it that you know her?

18   A.   Former girlfriend.

19   Q.   All right.  And were you -- are you familiar --

20        strike that.  Are you familiar with Steven and

21        Kathie Ford?

22   A.   Yes.

23   Q.   And how do you know them?

24   A.   Steve Ford is my brother-in-law; Kathie Ford is

25        my sister.

1  Q.  And how would you describe your relationship

2      with Kathie Ford?

3              MR. GREHER:  Objection to the form

4      of the question.

5              THE COURT:  Tell me why.

6              MR. GREHER:  It is too vague for

7      this witness to give a specific answer to

8      the question.  I don't -- I'm not sure I

9      understand it.

10             MR. PINSKY:  If I make it more

11     specific, I'm going to get a leading

12     objection.

13             THE COURT:  Yes, I was going to

14     say -- yes, exactly.  I'm going to overrule

15     your objection, because I would like to hear

16     the answer too.  I think it goes to the

17     credibility of this witness.

18  A.  It's been a hate-hate relationship most of our

19     life.  We are brother and sister, but it's been

20     a hate-hate relationship most of our life.

21  Q.  Are you -- strike that.  Did you have a meeting

22     or an encounter with Kathie Ford at some point

23     at Ann-Marie Westridge's house?

24  A.  Yes.

25  Q.  And please tell us how that meeting transpired;

1        what happened?

2    A.   Miss Ford came to the house, Ann Marie's house.

3         Knocked on the door, I answered the door.  She

4         wanted to know about her money.  She wanted to

5         know what to do about her money.  She wanted to

6         know about -- you know, she's not getting paid,

7         what's her next step.  She wanted to know what

8         to do.  I had no answers.  I told her it's

9         illegal for her to be there.  It's against the

10        law.  She needs to leave.  She said go ahead,

11        call the cops, have me arrested.  She refused to

12        leave.

13   Q.   What did you do next?

14   A.   Words were exchanged, tempers might have flared,

15        and she left.  She finally left, and I have not

16        spoken to her since.

17   Q.   Mr. Helgerman, do you live or did you live at

18        that time at Ann-Marie Westridge's house?

19   A.   No, never have.

20   Q.   Where did you live at that time?

21   A.   I live above Carmine's Restaurant on Route 6 in

22        Greenville.

23   Q.   In Greenville.  And did your sister know where

24        you lived?

25   A.   Yes.

1   Q.   How do you know she knew?

2   A.   Because my family was over there once before.

3         Mr. Ford had been to my house when I first moved

4         into it.

5   Q.   Do you have a cell phone?

6   A.   Yes.

7   Q.   Did you have a land line?

8   A.   No.

9   Q.   Did you ever call your sister on your cell

10       phone?

11   A.   No.

12   Q.   Did you ever give her your number?

13   A.   They've always had my number.

14   Q.   All right, sir.  On the day that Miss Ford came

15       to Miss Westridge's house and you had this

16       interaction, did you get a telephone call from

17       Miss Ford --

18   A.   No.

19   Q.   -- before she came?

20   A.   No.

21   Q.   Did you get a telephone call from Miss Ford the

22       day before she came?

23   A.   No.

24   Q.   The week before she came?

25   A.   No.

1    Q.   At any time before she came?

2    A.   No.

3              MR. PINSKY:  Pass the witness.

4              THE COURT:  Mr. Greher.

5     CROSS-EXAMINATION

6    BY MR. GREHER:

7    Q.   What kind of vehicle did you have at the time of

8         this incident?

9    A.   What kind of vehicle?

10   Q.   Yes.

11   A.   F-250 Ford, super duty.

12   Q.   And was it parked out in front of the house?

13   A.   No, it was parked out behind the house.

14   Q.   Behind the house?

15   A.   Yes.

16   Q.   Is there a parking lot behind the house?

17   A.   Yes, there was.

18              MR. PINSKY:  Objection, relevance.

19              THE COURT:  It's answered.  If

20         you're going to go that line of questioning,

21         though, I want know what you're trying to

22         do.

23              MR. GREHER:  The implication has

24         been raised by Mr. Pinsky that there would

25         have been no way for my client to know that

1       Mr. Helgerman was at this house at that

2       time.  That's the implication he's raised --

3       at least that's the implication that I

4       believe he's raised.

5              THE COURT:  Okay.

6    BY MR. GREHER:

7    Q.  Are you here voluntarily today or by subpoena?

8    A.  Voluntarily.

9    Q.  And when did you break off your relationship

10      with Miss Westridge?

11   A.  Seven and a half months ago.

12   Q.  And what were you doing at the house that night?

13   A.  At the time we were still together.

14   Q.  Were you living there?

15   A.  No, I've never lived there.

16   Q.  So you were there because you're there every

17      day?

18   A.  Because it's my girl -- it was my girlfriend at

19      the time.  You know, hanging out, having dinner,

20      whatever have you.  It was evening hours, it was

21      after work.

22   Q.  Okay, so tell us what happened.  The doorbell

23      rang, somebody knocked on the door, what was it?

24   A.  The doorbell rang.  Kathie came to the front

25      door.  I answered the front door.

1   Q.   Right.  And where was Miss Westridge at the

2        time, if you know?

3   A.   In the kitchen.

4   Q.   Okay, can you see the front door from the

5        kitchen?

6   A.   Vaguely.

7   Q.   Well, what does that mean?

8   A.   It means you can see it if you're standing at

9        the right angle, but you can't see directly to

10      it.

11   Q.   Well, when you went to answer the door, were you

12      able to observe or did you turn around and

13      observe Miss Westridge looking at the door?

14   A.   When I answered the door, did I turn around and

15      see her?  No.  She was in the kitchen at the

16      moment.

17   Q.   Okay, so you don't know if she was able to see

18      the door from where she was at the time you

19      opened the door?

20   A.   Correct.

21   Q.   Okay, so you open the door and there's your

22      sister?

23   A.   Correct.

24   Q.   What did you say to her and what did she say to

25      you?

1  A.   She asked about her money --

2  Q.   Well, exactly what were her words, do you

3       recall?

4  A.   She wanted to talk --

5            MR. PINSKY:  Objection, Your Honor.

6  A.   -- she wanted to know about her money.

7            THE COURT:  Excuse me, when he

8       stands up, you hush.

9            THE WITNESS:  Oh, sorry.

10           THE COURT:  Now, then, one question

11      at a time.  Is that going to be your

12      objection?

13           MR. PINSKY:  Yes, ma'am.

14           THE COURT:  Okay, one question at a

15      time.  Not three questions, one question.

16      So start at the beginning.  I'm going to

17      sustain the objection that I was about to

18      hear, because I was about to do the same

19      thing.  And ask one question at a time.

20           MR. PINSKY:  And, Your Honor, if I

21      can just complete that, and let the witness

22      finish his answer.

23           THE COURT:  Exactly, before you

24      interrupt and ask another question.  So

25      start again with those questions.

1          MR. GREHER:  Okay.

2          THE COURT:  One at a time.

3   BY MR. GREHER:

4   Q.   What did you say to her?

5   A.   I told her that she's not supposed to be there;

6        it is against the law.

7   Q.   Were those the first words out of your mouth?

8   A.   Yeah.

9   Q.   And what law was it against?

10  A.   Under the circumstance it was the bankruptcy

11       going on.  She was not supposed to be on the

12       premises, not supposed to be there.

13  Q.   Who told you that?

14  A.   The attorney.

15  Q.   When did the attorney tell you that?

16  A.   The attorneys told me with Mrs. Westridge --

17          THE COURT:  Mr. Greher, let's not

18       get confrontational.  That's enough of that.

19       I am putting in an objection.  You know good

20       and well it's not a law -- I mean that he's

21       not a lawyer.  So you can ask your

22       questions, but keep it to --

23   BY MR. GREHER:

24  Q.   Well, in response to your telling her that she

25       shouldn't be there, what did she say to you?

1   A.   She didn't care.  She told me go ahead, call --

2        because I told her I could call the cops.  She

3        said go ahead.  She wanted to know about her

4        money.  She wanted know what to do.  All I

5        wanted her to do was leave.  She shouldn't be

6        there.

7   Q.   She was asking those questions of you, correct?

8   A.   Yes.

9   Q.   All right, did she ask to speak to Miss

10       Westridge?

11   A.   No.

12   Q.   Did she in fact speak to Miss Westridge?

13   A.   Yes.

14   Q.   And tell us about that conversation; who

15       initiated that conversation, did Miss Westridge?

16   A.   Well, when Miss Westridge showed to the door to

17       see who was out there and see who it was.

18       Kathie told her to go back inside, it had

19       nothing to do with her.

20   Q.   So did you get the impression then that she only

21       wanted to talk to you at that time and place?

22   A.   {Indiscernible).

23            THE COURT:  That's not an answer.

24       You need to answer the question.

25   A.   No.

1              THE COURT:  Yes or no is a correct

2         answer.  Uh-huh is not an answer.

3    Q.   Well, what was your impression, what is it that

4         you thought she meant when she told Miss

5         Westridge to go back inside, that it was none of

6         her business?

7    A.   Because she was there in regards to the

8         situation regarding Miss Westridge.

9    Q.   So don't you think it would have been Miss

10        Westridge's business to stay there?

11   A.   Miss Westridge did stay there.  She stayed there

12        because it's her residence, it's her house.  She

13        had every right to be there.

14   Q.   And other than telling Miss Westridge to go back

15        inside, that it was none of her business, did

16        she say anything else to Miss Westridge?

17   A.   She wasn't able to.

18   Q.   So is that a no?

19   A.   No.

20   Q.   Okay, and then she left?

21   A.   Yes.

22              MR. GREHER:  Nothing further.

23              THE COURT:  Any redirect?

24              MR. PINSKY:  No, ma'am.

25              THE COURT:  May I excuse this

1    witness?

2         MR. GREHER:  You may.

3         THE COURT:  You may be excused.

4         THE WITNESS:  Go outside?

5         THE COURT:  You can go outside, or

6    you can go home, whichever you prefer.

7

8         (Witness excused.)

9

10        MR. PINSKY:  Your Honor, at this

11   time, before the debtor rests her main case,

12   I would like to state in my place that

13   Exhibit 6 is an invoice from my firm for

14   time spent prior to today working on the

15   prosecution of this motion, the preparation

16   of the joint pretrial order and preparation

17   for the hearing.

18        THE COURT:  Okay, and Mr. Greher,

19   you did not cross-examine Miss Malin on

20   this.

21        MR. GREHER:  Your Honor, it was my

22   thought that I would put in any opposition

23   to the time records in writing.

24        THE COURT:  We may not get there,

25   so we may do that in a minute.

1          MR. GREHER:  And with respect to

2     Mr. Pinsky, I would not want to be in

3     position to question him at this time in any

4     event, because he's the attorney.

5          THE COURT:  Okay, good.

6          MR. PINSKY:  So Your Honor, before

7     we rest our case, this is a true and correct

8     copy of contemporaneous time records of my

9     time working on this matter, and we would

10     move the introduction of Exhibit 6.

11          THE COURT:  I'm going to hold off

12     on both of those.

13          MR. PINSKY:  Yes, ma'am.

14          THE COURT:  And I will let Mr.

15     Greher at least have some kind of input into

16     yours and Miss Malin's records.

17          MR. PINSKY:  Of course, I just

18     didn't want to let that slip before we

19     rested.

20          THE COURT:  Thank you.

21          MR. PINSKY:  And we now rest.

22          THE COURT:  Okay, very good.

23          Mr. Greher.

24          MR. GREHER:  Your Honor, at this

25     time, on behalf of my clients, we move to

1          dismiss this proceeding on the grounds that

2          the debtor has failed to prove any type of a

3          prima facie case.

4                  THE COURT:  Overruled.

5                  MR. GREHER:  And further, on behalf

6          of my client, Kathie Ford, I move to dismiss

7          that she's not a creditor and so she can't

8          be subject to and liable to any of the

9          sanctions with respect to the Bankruptcy

10         Code.

11                 MR. PINSKY:  Your Honor, there is

12         no difference, based on the record before

13         this Court, between the actions of Miss Ford

14         on behalf of her husband, Steven Ford, and

15         the actions of a commercial collection

16         agency on behalf of an originating creditor.

17         Collectors are just as bound by the

18         automatic stay when they are on notice.  And

19         Miss Ford was certainly acting on behalf of

20         her husband.

21                 THE COURT:  You can go on, but I

22         overrule.  I overrule.  The motion to

23         dismiss is at this moment premature, if

24         not -- I think there is a prima facie case.

25         And I agree with Mr. Pinsky, being a

1     creditor, when you're attempting to collect

2     a debt from someone else as an agency, and

3     that's what you've got here.

4     MR. GREHER:  I would point out,

5     Your Honor, if I may, that there's a

6     significant difference between that analogy

7     and the instant situation.  And the

8     difference is that in the collection agency

9     scenario there is a definite agency

10    relationship in writing.  There's a

11    relationship between the principal and the

12    agency in writing.  We don't have that here.

13    THE COURT:  I'm not about to allow

14    the Bankruptcy Code to be so distorted as to

15    the way you're trying to have it ruled, and

16    I will not rule that way.  You may take me

17    up on it, or you may write on it, whatever

18    you want to do, but I will not rule that

19    way.

20    Again, just a quickie here, marital

21    property, so.

22    MR. GREHER:  So Mr. Pinsky has

23    rested, so --

24    THE COURT:  It's your turn.

25    MR. GREHER:  Very good.  At this

  1        time I call Steven Ford.

  2                  THE COURT:  Mr. Ford, let me remind

  3        you you're under oath.  If you'll be seated,

  4        please.  State your full name.

  5                  THE WITNESS:  Steven J. Ford.

  6                  THE COURT:  And your address,

  7        please.

  8                  THE WITNESS:  27 Carter Road, New

  9        Hampton, New York 10958.

 10                  THE COURT:  Very good.  He's your

 11        witness.

 12

 13                  (STEVEN FORD, having been

 14        previously duly sworn, testified as

 15        follows:)

 16

 17                  MR. GREHER:  Thank you.

 18     DIRECT EXAMINATION

 19     BY MR. GREHER:

 20     Q.   Mr. Ford, were you present at a Bankruptcy Court

 21        341 meeting on May 30th, 2007?

 22     A.   Yes.

 23     Q.   And when you got there at that date was Miss

 24        Westridge already there?

 25     A.   No.

1  Q.  And about how long after you got there did she

2      arrive?

3  A.  Oh, 20 minutes, 15.

4  Q.  Okay, did you ever see her park her car?

5  A.  No.

6  Q.  Did you have any idea where she parked her car?

7  A.  No idea.

8  Q.  Now, did there come a time at that date where a

9      meeting was conducted by Jeffrey Sapir, the

10     Chapter 13 trustee?

11 A.  Yes.

12 Q.  And were you present at that meeting?

13 A.  Yes, I was.

14 Q.  And at the end of Mr. Sapir's inquiry were you

15     given an opportunity to ask any questions?

16 A.  Yes.

17 Q.  Okay.  And were any questions asked by either

18     you or your wife?

19 A.  By my wife, yes.

20 Q.  Okay.  And do you recall what questions were

21     asked at that time?

22 A.  It was to do with the home that the -- the value

23     of the home, yes.

24 Q.  Okay.  And was there any shouting at that

25     meeting?

1    A.   Not shouting, no.

2    Q.   Okay, was there anybody raising their voices?

3    A.   Yes, some voice raising, yes.

4    Q.   Did Kathie raise her voice?

5    A.   Not really, maybe a little bit.

6    Q.   Did Miss Malin raise her voice?

7    A.   Yes, she did.

8    Q.   And what about Miss Westridge, did she raise her

9         voice?

10   A.   No.

11   Q.   What about Mr. Sapir?

12   A.   No.

13   Q.   What about you?

14   A.   No.

15   Q.   Okay.  Were other creditors there?

16   A.   Yes.

17   Q.   Any of them raise their voices?

18   A.   No.

19   Q.   There came a time when the meeting was over and

20        you left?

21   A.   Yes.

22   Q.   And did something take place outside of the

23        courthouse on that day?

24   A.   Yes, it did.

25   Q.   Tell us what happened at that time and place, if

1      you would?

2  A.  Well, Ann-Marie and her sister left before us,

3      and they walked down the steps, and my wife was

4      ahead of me.  Whew.  And my wife was yelling a

5      little bit.

6  Q.  What was she yelling, do you recall the words?

7  A.  She was yelling at Sandy, not at Ann-Marie, she

8      was -- whatever.  I walked down to the sidewalk

9      to speak to Ann-Marie.  And I said, "Ann-Marie,

10     you were my friend, how can you do this to me?"

11     And I said, "why?  Why?  Why?  I don't get it."

12     And I was moving my hands.  I might have touched

13     her, yes.  And she never said a word.  And

14     Sandy, she was like leave my sister alone,

15     whatever.  I was like oh, my gosh, what's going

16     on.  And I sort of walked away in disbelief.  I

17     couldn't believe this just happened.  And I

18     remember Miss Malin coming out, and she says,

19     "girls, you need to come inside."  And that was

20     it.  I'm sorry.

21  Q.  Other than what you just described in terms of

22     your conversation, did you say anything else to

23     anybody at that time and place?

24  A.  No, no, I did not.

25  Q.  And when Miss Malin came out and asked Miss

1          Westridge and her sister to come back inside --

2    A.   To come back in, yes.

3    Q.   -- did they go back inside?

4    A.   Yes, they did.

5    Q.   And what did you do at that time?

6    A.   I -- we left.

7    Q.   Okay.  Where did you go?

8    A.   We went home.

9    Q.   Okay, did you wait around to follow anybody to

10        their car?

11   A.   No, I wanted to get -- no, no.

12   Q.   Okay.  Since that time have you had any

13        conversation with Miss Westridge at any time?

14   A.   No.

15             MR. GREHER:  I have nothing further

16        of this witness.

17             THE COURT:  Mr. Pinsky, your

18        witness.

19             MR. PINSKY:  Thank you, Your Honor.

20   CROSS-EXAMINATION

21   BY MR. PINSKY:

22   Q.   Mr. Ford, why was your wife at the creditors'

23        meeting?

24   A.   For support.

25   Q.   For support, okay.  And did you ask her to come?

1    A.    Yes, I did.

2    Q.    All right.  And why did you ask her to come?

3    A.    For support.  I need support, as you can see.

4    Q.    For support, all right.  And it was your money

5          that you were looking to get repaid, right?

6    A.    Yes.

7    Q.    All right.  And so you asked questions of Miss

8          Westridge at meeting, right?

9    A.    No, I did not.

10   Q.    Why not?

11   A.    I -- my wife is very good at that, better than

12         me.  As you can see, you know, it is a little

13         overwhelming for me, so I let her ask the

14         questions.

15   Q.    Why did you go?

16   A.    Because I'm a creditor on a case, and I wanted

17         to see what this was all about.  I wanted to

18         learn a little bit.

19   Q.    And you wanted to get paid?

20   A.    Yeah.

21   Q.    And so your wife did essentially all the

22         talking?

23   A.    Yeah, there was very little, because the trustee

24         does most of the talking.  He didn't really

25         allow you to talk much, so there was very

1      little.

2   Q.  But you deferred to her?

3   A.  What?

4   Q.  You deferred to your wife --

5   A.  Yes.

6   Q.  -- when it came to statements or questions?

7   A.  Yes.

8   Q.  Is that something you normally do?

9   A.  In certain circumstances, yes.

10  Q.  All right, sure.  And she was asking questions

11      about the claim that you were asserting?

12  A.  Yes.

13  Q.  All right.  Now, when you went outside, Mr.

14      Ford, how long were you outside with Miss

15      Westridge and her sister and your wife?

16  A.  Oh, a minute.

17  Q.  A minute?

18  A.  Two minutes.

19  Q.  A minute or two, okay.  And what -- you said

20      that your wife was yelling, what was she

21      yelling?

22  A.  I just wanted to speak to Ann-Marie.  I didn't

23      know -- it was some yelling with her and Sandy.

24      I wanted to speak to Ann-Marie.  She was the one

25      I dealt with.

     1                    MR. PINSKY:  Objection,

     2          nonresponsive.

     3     Q.   What did your wife yell?

     4     A.   I don't recall.

     5     Q.   Okay, you don't recall anything that she said?

     6     A.   No.

     7     Q.   And how long was she yelling?

     8     A.   I don't recall that.

     9     Q.   Was it a minute?

    10     A.   Probably not.

    11     Q.   Two minutes?

    12     A.   No.

    13     Q.   30 seconds?

    14     A.   I have no idea.  I don't recall her yelling.

    15          Like I said, I was focused on Ann-Marie.

    16     Q.   You don't recall anything at all that she said

    17          during that time?

    18     A.   Language, no.

    19                    MR. PINSKY:  Pass the witness, Your

    20          Honor.

    21                    THE COURT:  Any redirect?

    22                    MR. GREHER:  No, Your Honor, thank

    23          you.

    24                    THE COURT:  You may step down.

    25

1              (Witness excused.)

2

3              MR. GREHER:  Kathie Ford.

4              THE COURT:  Miss Ford, let me

5       remind you you're under oath.  And we need

6       you to give us your full name.

7              THE WITNESS:  Sure.  Kathleen Ford.

8              THE COURT:  And your address,

9       please, Miss Ford.

10             THE WITNESS:  27 Carter Road, New

11      Hampton, New York 10958.

12             THE COURT:  She's your witness.

13             MR. GREHER:  Thank you.

14

15             (KATHLEEN FORD, having been

16      previously duly sworn, testified as

17      follows:)

18

19   DIRECT EXAMINATION

20   BY MR. GREHER:

21   Q.   Kathie, you were at the 341 meeting on May 30th?

22   A.   Yes.

23   Q.   And did you participate in any questioning of

24        Ann-Marie Westridge at that time and place?

25   A.   Regarding the situation, yes, I did.

1    Q.   And do you recall what questions you asked at

2         that time?

3    A.   I basically was inquiring about the sale of her

4         home.

5    Q.   Okay, and was that question addressed to Miss

6         Westridge or to her attorney or to Mr. Sapir?

7    A.   Mr. Sapir.

8    Q.   Okay.  And the responses that you received to

9         those questions, were they from Mr. Sapir or

10        somebody else?

11   A.   Her attorney, Andrea, would basically just say

12        get a lawyer.  Mr. Sapir would -- when he --

13        when it was appropriate would say I cannot give

14        you advice.

15   Q.   Okay, so you did not have an attorney when you

16        went there, is that correct?

17   A.   No, we did not, no.

18   Q.   Did you consult with any attorney prior to going

19        to this meeting?

20   A.   No, we did not.

21   Q.   Okay.  At any time during the period of time

22        that you were in the meeting room, were you

23        raising -- did you raise your voice?

24   A.   No.

25   Q.   Did there come a time afterwards that you raised

1      your voice?

2   A.   Was I outside yet, or still in --

3   Q.   Did there come a time when you went outside?

4   A.   Yes.

5   Q.   And when you went outside, did you raise your

6        voice?

7   A.   I'm sure I got a little loud.

8   Q.   Do you recall what it was you said and who it

9        was you said it to?

10  A.   I absolutely do.  I said to Ann-Marie, if you

11       are going to call my brother, the least you can

12       do is tell him the truth.

13  Q.   Now, what is that in reference to?

14  A.   That is in reference to the first meeting which

15       we attended.  I was -- again, I am sure you all

16       must realize that I might as well read Japanese

17       when I read all the papers that come from the

18       Court.  And I had some questions regarding

19       things that I would ask at the meeting.  She had

20       her son's vehicles listed in one spot, and I

21       know it was my brother's truck, but it was

22       listed under a different category, differently,

23       and I questioned, like, why is this listed over

24       here?  I didn't want the truck.  I didn't go

25       after the truck.  I was just asking why is the

1          truck over here.  She proceeded to go back and

2          tell my brother that I went after his truck.

3     Q.   So that was why you said what you said outside?

4     A.   That is exactly why.

5     Q.   And is that the only thing you said to Miss

6          Westridge?

7     A.   That is all I said to Miss Westridge.

8     Q.   Now, did you say something to somebody else?

9     A.   Well, then her sister swung around quite

10         quickly, and I was away from them, as everybody

11         stated, I was up on the thing.  And I -- the

12         truth is I really don't recall, but her sister

13         and I engaged in, you know, confrontation at

14         that point.

15    Q.   Were you using any profanities, and if so, what

16         was it that you said?

17    A.   I may have called her sister a bitch, maybe.

18         And I can tell you one other part that I do

19         recall.  And that is when their attorney did

20         open the door to tell the girls to come in, as

21         they came up the steps, her sister turned to me

22         and said this is all your fault.  And to which I

23         replied, "I am not responsible for a $380,000

24         debt."

25    Q.   Okay, was that it at that time?

1    A.    That was it.

2    Q.    When Miss Malin called her client and her sister

3          back in, what did you do?

4    A.    We went to the car and we went home.

5    Q.    Did you have any idea where Miss Westridge was

6          parked?

7    A.    No, I did not.

8    Q.    Okay.  Did there come an incident five months

9          later?

10   A.    There was.

11   Q.    Would you tell us what happened at that time and

12         place?

13   A.    At that time our attorney was Mr. O'Leary, and

14         there was something with Court that he had

15         attended, and I hadn't heard from him.  I called

16         his office to find out what had happened, and

17         his assistant said, oh, you didn't --

18   Q.    Well, you can't tell us what somebody else said,

19         but you can tell us what you did as a result of

20         that?

21              MR. PINSKY:  Your Honor, I believe

22         Mr. Greher opened the door.

23              THE COURT:  I think so too.  She

24         can go on.

25              MR. GREHER:  That's fine, I have no

1    problems with it.

2             THE WITNESS:  Oh, okay.

3             MR. GREHER:  I was just trying to

4    avoid hearsay.

5    Q.  By all means, tell us what did he say?

6    A.  Sure, okay.  She said, oh, you obviously didn't

7        get the letter yet.  And I said regarding?  And

8        she said, well, they have changed it from

9        initially a loan to it's now an investment.  You

10       invested in a company that went belly up.  I

11       said, well, but that's a lie.  I got off the

12       phone, whatever -- do you want me to continue

13       with the evening?

14   Q.  Sure.

15   A.  I had to take both of my children to sign them

16       up for baseball at the school.  I went to the

17       school, I signed them up.  When I left I did

18       drive to my brother's residence; his truck was

19       not there.  I then drove to Miss Westridge's

20       house, and I wasn't sure, a very long dark

21       driveway.  I turned the lights down the driveway

22       to see.  I saw my brother's truck.  I saw her

23       son's vehicle, and I saw her husband's vehicle.

24       I drove down.  I rang the door well.  Billy came

25       to the -- William, whatever we're calling him --

1        came to the door, and I said what's going on?

2        You're now -- you've now flipped it to an

3        investment, which you know is a lie.  How am I

4        supposed to fight a lie?  You know, it's one

5        thing to fight a fight fair, but now you're

6        lying.  What am I supposed to do.  He said I

7        don't know what to tell you.  You invested in a

8        company that went belly up.

9              I'm not quite sure at what point Miss

10       Westridge came to the door, but Billy and I

11       continued a little bit.  One of the things I did

12       talk to Billy about was his relationship with

13       Steve.  And I said, you know, Billy, you were

14       the one who came to Steve and said could you

15       help us.  I said at no point did it ever occur

16       to you to apologize to Steve, to say I'm sorry

17       this went down, I know you were just trying to

18       help us.

19              At some point Miss Westridge opened

20       the door, just a crack.  I did say to Billy --

21       to Billy -- I didn't look at her, could you

22       please tell her to go inside.  She said it's my

23       house.  I responded with it's my brother.

24              You know, Billy basically was like oh,

25       you know, what good would it do to say anything

1          to Steve and blah blah blah.  And twice he broke

2          out into complete utter tantrums.  One was about

3          my truck, which I told you, she told him I went

4          after, which I didn't.  And at some point she

5          did say and you forged my name, and Billy said,

6          yeah, you forged her name, which I said --

7                    THE COURT:  Can we have a question

8          here?

9                    THE WITNESS:  I'm sorry.

10                   MR. GREHER:  Okay.

11                   THE COURT:  Thank you, Mr. Greher.

12                   THE WITNESS:  Am I rambling?

13                   THE COURT:  Yes.

14                   THE WITNESS:  You should have cut

15         me off.

16                   MR. GREHER:  Okay.

17    Q.   How long were you in front of the house?

18    A.   Oh, five minutes.

19    Q.   Other than telling Miss Westridge to go inside,

20         it was none of her business, did you have any

21         conversation with her at all?

22    A.   Absolutely not.

23    Q.   And other than -- strike that.  Did she in fact

24         go back inside?

25    A.   No, she did not.

1  Q.  And how long was she standing by the door before

2      you left?

3  A.  I don't know, three minutes.

4  Q.  And during that three-minute period, were you

5      and your brother arguing?

6  A.  He was arguing with me.

7  Q.  Okay, and were you arguing back?

8  A.  No.

9  Q.  Were you raising your voice?

10 A.  Never, never.

11 Q.  And there came a point when you left?

12 A.  Yes.

13 Q.  That's it?

14 A.  When he slammed the door in my face.

15 Q.  And you left?

16 A.  I left.

17            MR. GREHER:  Okay, nothing further.

18            THE COURT:  Yours, Mr. Pinsky.

19            MR. PINSKY:  Thank you, Your Honor.

20  CROSS-EXAMINATION

21  BY MR. PINSKY:

22 Q.  So Miss Ford --

23 A.  Yeah.

24 Q.  -- how long was it that you had that

25      conversation with Mr. O'Leary's office that you

1    drove over to Miss Westridge's house?

2  A.  I was --

3            MR. GREHER:  I object to the

4       question.  It's not a fair characterization

5       of the statement.  The witness had

6       previously testified that she drove and took

7       her kids to sign up for baseball.

8            THE COURT:  I'm going to overrule

9       your objection.

10  Q.  So it was hours?

11  A.  Hours, right.

12  Q.  And it was the same day?

13  A.  Correct.

14  Q.  All right.  And what was it that Mr. O'Leary's

15       office told you, that you didn't have a claim in

16       the case?

17  A.  That -- right, and that they had received

18       paperwork --

19  Q.  And that you wouldn't get paid?

20  A.  No, not that we wouldn't get paid.  That it had

21       been changed to an investment, that you invested

22       in a company.

23  Q.  That went belly up?

24  A.  That's what Billy said.

25  Q.  That no longer had any money?

1  A.    That's what Billy said.  That's not what the

2        attorney said.

3               MR. PINSKY:  Thank you, Your Honor.

4               THE COURT:  Redirect?

5               MR. GREHER:  No, Your Honor.

6               THE COURT:  You may step down.

7

8               (Witness excused.)

9

10              THE COURT:  Mr. Greher.

11              MR. GREHER:  We rest, Your Honor.

12              THE COURT:  Okay, what do you

13       two --

14              MR. PINSKY:  Well, Judge, the last

15       time I was here, I started rambling on what

16       sounded like a closing statement, and you

17       told me to do it in writing.

18              THE COURT:  Yeah, and I'm not so

19       sure.  The Court will take about a

20       ten-minute recess.

21              THE CLERK:  All rise.

22

23              (Recess in the proceeding.)

24

25              (Discussion Off the record.)

1              THE COURT:  He knows to come right

2         back in, I'm sure.

3              MR. PINSKY:  I think Miss Malin is

4         going to get him.

5              THE COURT:  If you'll see, please.

6

7              (Discussion off the record.)

8

9              THE COURT:  We are going to take a

10        recess until 2:00 p.m.

11             MR. PINSKY:  Yes, ma'am.

12             THE COURT:  When we come back at

13        2:00 p.m., I'm going to give each of you

14        thirty minutes closing argument, and then I

15        will give you rebuttal for maybe ten or

16        fifteen minutes after that.

17             MR. PINSKY:  Thank you.

18             THE COURT:  So that gives you time

19        to get your thoughts together to come in.

20        I've decided to do it orally.  I think I'm

21        not willing to, at this point, do the

22        expense of a transcript and all the other

23        things.

24             MR. GREHER:  Very good.

25             THE COURT:  So we'll see you back

```
1    at 2:00 p.m.

2              MR. PINSKY:  Very good.

3              THE CLERK:  All rise.

4

5              (Recess in the proceedings.)

6

7              THE COURT:  It's your action.

8              MR. PINSKY:  Yes, ma'am.

9              THE COURT:  So if you will begin.

10   We are looking at the clock.

11             MR. PINSKY:  Would you like me to

12   stand up here?

13             THE COURT:  I think it would be

14   more comfortable for you standing right

15   there.  And I can see you closer.

16             MR. PINSKY:  Very good.

17             THE COURT:  Go right ahead.

18             MR. PINSKY:  Section 322(a)(6) of

19   the Bankruptcy Code operates as a stay of

20   any act to collect, assess or recover a

21   claim against the debtor that arose before

22   the commencement of the case under this

23   title.  Section 362(k), formerly 362(h),

24   provides that an individual injured by any

25   willful violation of the stay provided by
```

1    this section shall recover actual damages,

2    including costs and attorneys' fees, and in

3    appropriate circumstances, may recover

4    punitive damages.

5         Now, for purposes of Section

6    362(k), an act is willful if it is done with

7    knowledge or notice of the filing and

8    pendency of the bankruptcy case.  It's clear

9    and undisputed that Steven and Kathie Ford

10   had knowledge of the bankruptcy case.  Mr.

11   Ford was scheduled as a creditor and filed a

12   claim in the case.  The Fords actively took

13   part in two Section 341(a) meetings in order

14   to obtain payment, they hoped, on Steven

15   Ford's disputed pre-petition claim.  So I

16   believe willfulness is just -- it's not an

17   issue in this case.  It's established as a

18   matter of law.  Even if the Court

19   disregarded the testimony of the debtor's

20   witnesses -- and I'm not suggesting that the

21   Court should -- I believe Steven Ford's

22   testimony about the events that took place

23   after the Chapter 13 341(a) meeting

24   establishes a violation of the stay.  Mr.

25   Ford testified that he approached the debtor

1    after the creditors' meeting outside of the

2    building, and in a conversation that lasted

3    perhaps one or two minutes asked her how she

4    could do this to him and said that they

5    needed to talk.  He admitted that he may

6    have put his hand on her at this time.

7         His wife, Kathie Ford, testified

8    that while this was occurring she was

9    engaged in a shouting match with the

10   debtor's sister in the immediate vicinity.

11        The plain implication of Mr. Ford's

12   speech and actions in the context of the

13   heated remarks being exchanged close by is

14   that of a creditor applying pressure to

15   collect a debt, in violation of Bankruptcy

16   Code Section 362(a)(6).

17        The testimony of the debtor's

18   witnesses was generally consistent and, I

19   believe, credible.  The debtor testified

20   that Steven Ford grabbed her arm outside of

21   the building where the creditors' meeting

22   was being held; told her that he wanted to

23   talk to her, while Kathie Ford demanded her

24   fucking money and called the debtor's sister

25   a bitch, Sandra Raymond.  The debtor further

1    testified that when her attorney, Andrea

2    Malin, told the debtor and Miss Raymond to

3    get inside, Steven Ford told the debtor, in

4    a manner that I believe could only be

5    construed as impliedly threatening, that the

6    Fords would be waiting for the debtor at her

7    car.

8           Andrea Malin testified that she and

9    a number of other lawyers heard shouting

10   outside the Section 341(a) room after the

11   debtor and her sister had left the room.

12   Miss Malin testified that she observed

13   Steven Ford holding the debtor by her arm,

14   and that Sandra Raymond had placed herself

15   between the debtor and Steven Ford.  Miss

16   Malin further testified that Kathie Ford was

17   shouting "I want my fucking money" and

18   called Sandra Raymond a bitch, during a

19   diatribe that lasted for a minute or two.

20          Miss Malin testified that the

21   debtor was crying and appeared to be upset.

22   After directing her client and Miss Raymond

23   to go back inside the building, Miss Malin

24   testified, as did the debtor, that she heard

25   Steven Ford say that they, the Fords, would

1          be waiting for the debtor at her car.

2                    Sandra Raymond testified that the

3          Fords were waiting for her and the debtor

4          when they exited the building, having left

5          the Section 341(a) meeting room, and that

6          Steven Ford accosted the debtor, grabbing

7          her by the arm.  While Kathie Ford stood

8          above them on the porch stoop and shouted,

9          once again, "I want my fucking money."

10         While she was not certain to the time that

11         elapsed during this confrontation, Miss

12         Raymond thought it was between one and two

13         minutes.  Miss Raymond further testified

14         that she and the debtor were attempting to

15         leave the premises when they exited the

16         building, and that she told the debtor

17         "let's go", but that Steven Ford was holding

18         the debtor's arm and that she was crying and

19         looked upset.

20                   Miss Raymond also testified that

21         she heard Steven Ford remark that they, the

22         Fords, would be waiting for the debtor at

23         her car, as they were directed back inside

24         the building by Miss Malin.

25                   Mr. Helgerman testified that he was

1    present one evening at the debtor's home

2    when Kathie Ford arrived.  He testified that

3    he answered the door, and upon seeing Kathie

4    Ford said that it was illegal for her to be

5    there and told her to go away.  He further

6    testified that Kathie Ford -- that she

7    wanted her money and asked him what he was

8    going to do about it.  He testified that he

9    replied nothing, and again demanded that she

10   leave.  Miss Ford refused.

11        The debtor testified that she was

12   in the kitchen preparing dinner when she

13   heard shouting at the front door and came

14   out to investigate.  When she came out and

15   saw Kathie Ford, she asked her to leave, and

16   received the reply that the argument was

17   none of her business and to go inside.  She

18   remained, as did Kathie Ford, for perhaps

19   another two minutes before she finally left.

20        Mrs. Ford testified that she made

21   that trip to the debtor's residence within

22   hours of having a conversation with her

23   attorney's office in which she learned that

24   the debtor had amended her bankruptcy papers

25   to list Steven Ford's claim as a corporate

1    debt of All Points Construction, the

2    debtor's defunct corporation.

3         The debtor has consistently

4    testified here today that any claim that

5    Steven Ford asserted in the case arose from

6    investments that he had made in All Points

7    Construction.

8         Now, Your Honor, in this case our

9    burden of proof is to make our case by a

10   preponderance of the evidence.  We have to

11   establish if the Court believes, as I did,

12   that notice or knowledge, willfulness is not

13   an issue whether there's been a violation of

14   the stay, has there been any act to collect,

15   assess or recover a claim against the debtor

16   that arose before the filing of the

17   petition.  Miss Westridge initially

18   scheduled Mr. Ford's claim as an individual

19   claim.  Mr. Ford filed a claim individually.

20   There later arose a dispute.  But regardless

21   of the character of the claim, whether it's

22   ultimately determined to have been corporate

23   or personal, there is no dispute that Mr.

24   Ford and his wife, Kathie Ford, sought to

25   recover it from this debtor.  And that's

1    what counts.  They attempted to recover a

2    claim against the debtor that arose before

3    the filing of the case.

4         I believe the debtor's witnesses

5    were credible, and I have serious questions

6    about the credibility of the respondents.

7    That's not up to me.  That's up to the

8    Court.  But it's hard to understand how this

9    conduct taken in context could amount to

10   anything other than an attempt to pressure

11   the debtor to make good on a claim that the

12   Fords insisted she was responsible for.

13   They went to substantial lengths to do this.

14        This motion has been pending before

15   Your Honor for well over a year.  It's been

16   adjourned again and again and again.  The

17   claims litigation was extensive and was

18   finally resolved after it was fully briefed

19   by a withdrawal of the claim by the Fords'

20   attorney.  I can't understand what the

21   conduct that took place in these two events

22   in the overall context of the case could

23   have been, other than an attempt to get

24   money from the debtor.  I believe that is an

25   act in violation of Section 362(a)(6).

1              If Your Honor agrees that there has

2       been a willful violation of the stay, I

3       believe we're faced with a subsidiary issue,

4       and that is whether there has been an

5       egregious violation of this stay such as to

6       call for the imposition of punitive damages.

7       If the Court were to so find, I believe we'd

8       need to have a subsequent hearing on

9       punitive damages.  Because one of the

10      elements that we are required to take into

11      account in such a motion, such a hearing is

12      the wealth of the defendant, so that the

13      sanction that is awarded by the Court is

14      sufficient, given their net worth, to sting

15      the pocketbook of the wrongdoer.

16              Thank you for your time.

17              THE COURT:  Very good.

18              Mr. Greher.

19              MR. GREHER:  Thank you, Your Honor.

20              While we are a nation of laws, it's

21      impossible for every single citizen to be

22      cognizant of every single law that this

23      country has.  And while it has often been

24      said that ignorance of the law is no excuse,

25      the ignorance of the law is certainly

1    something that a Court can consider in

2    mitigation.

3            In this particular instance, Your

4    Honor, there has been absolutely no

5    testimony or proof of any shape, nature or

6    form to indicate that my clients knew of the

7    existence of Section 362 of the Bankruptcy

8    Code, knew what it meant, knew what the

9    consequences were of a violation, or even

10   knew how to violate that.  They were not

11   represented by counsel.  They were

12   individuals who went to a Bankruptcy Court

13   meeting because they thought they had to be

14   at that meeting and tried to find out what

15   the situation was by themselves.

16           Now with respect to Section 362,

17   Your Honor, I would submit to this Court and

18   to everybody that probably technical

19   violations take place on a daily basis

20   throughout this country.  And what the Court

21   really needs to determine is whether or not

22   it's a question of the technical violation

23   with no harm, no foul, or is it the type of

24   violation that was an intentional and

25   knowing violation that was done by somebody

1     with an attempt or a series of attempts to

2     try to collect on a preexisting debt.  And I

3     would submit to Your Honor that in this

4     particular case we have a situation where if

5     there was a violation it was not a willful

6     violation, and it was not an intentional

7     violation.

8           The movie "The Godfather" is fame

9     house for having many great lines that have

10    come back down into history and that people

11    use on a daily basis.  And the one that

12    comes to mind for me quite often, Your

13    Honor, is the line, "it's not personal; it's

14    just business."  And I would submit to Your

15    Honor that this particular instance is

16    purely personal.  What took place or did not

17    take place in this particular case, Your

18    Honor, was done and was driven purely by

19    emotion.

20          Mr. Ford is a hard-working farmer.

21    Works very hard for his money.  $50,000 is a

22    lot of money.  And it's $50,000 that his

23    brother-in-law talked him into giving to his

24    brother-in-law's girlfriend.  And he did it;

25    there's no question about it, he did it.  A

1        time came where he is confronted with the

2        fact that his money may very well be gone.

3        Was he upset?  You're darn right he was

4        upset.  Was his wife upset?  I'm sure she

5        was.  This was an emotionally charged

6        situation.  And the 341 meeting, Your Honor,

7        was an emotionally charged situation.  There

8        were other creditors there.  A lot of

9        people, in their own mind at the very least,

10       felt they got hurt by this debtor.  I'm not

11       going to pass on whether they did or did

12       not, but the bottom line is that emotions

13       were rampant in that courtroom.  There's no

14       question in my mind.

15              With respect to what took place or

16       did not take place outside, there was

17       obviously --

18              THE COURT:  (Coughing).  One

19       second, I'm sorry.  I didn't mean to

20       interrupt.  I apologize, Mr. Greher.  I

21       think I'm okay.

22              MR. GREHER:  What took place

23       outside the courtroom was still a carryover

24       from an emotionally-charged situation.

25              Now, we have heard conflicting

1      stories as to what in fact took place out

2      there, and I'm not going to belabor that

3      point.  Your Honor had the opportunity to

4      hear those conflicting stories, and you

5      further had the opportunity to assess the

6      credibility and the demeanor of the

7      witnesses who testified concerning those

8      transactions or what took place.  But one

9      thing is clear, that with respect to what

10     took place there, other than emotion, there

11     was no demands for money, there were no

12     efforts to try to collect.  These were

13     people who were venting.  Both sides were

14     venting.  I would submit to this Court that

15     any of the actions that may have been

16     undertaken here were not intentionally and

17     willful violations of any statute or any

18     section of the Bankruptcy Code.

19          Now in hindsight was the conduct of

20     the parties proper under the circumstances?

21     Maybe, maybe not. But I would submit to Your

22     Honor that nothing took place outside of the

23     courtroom, outside of the courthouse that

24     would give rise to a willful and intentional

25     knowing violation of the automatic stay.

1        With respect to the incident that

2    took place five months later -- and I think

3    it's important for the Court to realize that

4    there was no contact during that five-month

5    period.  That belies the claim that there

6    was some type of unified effort on the part

7    of Mr. and Mrs. Ford to attempt to collect

8    monies that they felt were due to them in

9    violation of the automatic stay.  At that

10    particular instance, Your Honor, five months

11    later, the conversation was between Kathie

12    Ford and her brother.  At the point in time

13    when Miss Westridge came on the scene to the

14    front door, she was told by Kathie to go

15    back inside; it was none of her business.

16    That's hardly an effort on the part of Mr.

17    and Mrs. Ford to collect monies from Miss

18    Westridge.  It was a family dispute with

19    what appears to be somewhat of a

20    dysfunctional family, and it's got nothing

21    to do with this case, Judge.  It truly

22    doesn't.  The circumstances of where it took

23    place is the only connection to this case.

24    And the only reason that my client was there

25    was because she saw her brother's car there,

      1          after first trying to locate her brother at
      2          a different location.
      3                    Now with respect to the actual
      4          testimony, once again, I really don't intend
      5          to belabor it too much, but I would point
      6          out to Your Honor that there are certain
      7          inconsistencies with respect to the
      8          testimony.  Some of the testimony of the
      9          debtor was made out of whole cloth; some of
     10          it was absolutely honest and accurate, and
     11          some of it was totally false and
     12          contradictory to the statements contained in
     13          her affidavit, which precipitated this whole
     14          action.
     15                    With respect to the October
     16          incident, Your Honor, the debtor in her
     17          affidavit said that -- and I quote here --
     18          if I can just find it here, she says that
     19          "Kathie Ford made many physical threats to
     20          her at the door."  There was no testimony of
     21          any such threats.  In fact, Miss Westridge
     22          said that the only statement made was "go
     23          back inside, it's none of your business."
     24          She also testified or she also set forth in
     25          her affidavit that after this incident she

1      contacted the State Police.  There is no

2      testimony to that effect.

3              The testimony concerning what may

4      or may not have taken place at the end of

5      the incident outside the courtroom is

6      likewise misleading.  The statement that Mr.

7      Ford said, "we'll wait for you by your car,"

8      Judge, that's a ridiculous statement.  And

9      the reason it's ridiculous is because the

10     testimony clearly established that the Fords

11     were already there when Miss Westridge came

12     into the 341 meeting.  They would not

13     know -- they would not have seen her park

14     her car, number one.  Number two, there are

15     five different parking lots in the area.  So

16     it's a statement that has no basis in

17     anything.  I think it is a gratuitous

18     statement.  I think it's made up.  I don't

19     believe it.

20              .  Certainly the other statements,

21     obviously, there may have been physical

22     contact.  I don't think it was the type of

23     physical contact that would give rise to an

24     assault.  I think it's the type of contact

25     that if it in fact existed is the normal

1      type of contact that people who know each

2      other would in fact engage in when they are

3      trying to have a conversation.  People,

4      including myself, Your Honor, have a

5      tendency to sometimes gesticulate.

6      Sometimes that gesticulation can go a little

7      bit further from the body than it should.

8      There is no attempt to physically harm Miss

9      Westridge here.  I think that was the

10     furthest thing from anybody's mind.  I don't

11     think anything like that existed.

12          Bottom line, Your Honor, once again

13     I say that whatever took place was

14     emotionally driven.  It was not anything

15     intentional.  It was not a known violation.

16     It was certainly not willful and certainly

17     not egregious.  And I believe at this point

18     in time, Your Honor, that the Court should

19     dismiss these proceedings.

20          I thank you for your time.

21          THE COURT:  Thank you, Mr. Greher.

22          Mr. Pinsky, any rebuttal?

23          MR. PINSKY:  Your Honor, the

24     automatic stay is in place not only to

25     protect the assets of an estate and the

 1    assets of the debtor in certain

 2    circumstances, it's in place to protect the

 3    jurisdiction of this Court.  It's the

 4    fundamental mechanism for this Court's

 5    jurisdiction over all property of the

 6    estate, very broadly construed.

 7         If it's possible for this kind of

 8    conduct to occur without a sanction, on the

 9    very doorstep of either the courthouse or a

10    meeting room where creditors' meetings are

11    held, the automatic stay has very little

12    meaning.

13         Contrary to learned opposing

14    counsel's remarks, if Your Honor were to

15    believe the testimony of the debtor's

16    witnesses, the conduct of the Fords after

17    that meeting was truly outrageous.  And

18    given the time relationship between Mrs.

19    Ford's learning that the claim that they had

20    so avidly pursued might now be lost because

21    it was being rescheduled as a corporate

22    claim that was unrecoverable, the timing

23    between that and her appearance at the

24    debtor's house could not be a mere

25    coincidence.  Five months had passed, as Mr.

1         Greher has pointed out, and it's very hard

2         to believe that the reason that she was

3         there wasn't because of that telephone call

4         with Mr. O'Leary's office.  And Mr.

5         Helgerman was clear that Mrs. Ford wanted

6         him to get the debt paid.

7                At that time Mr. Helgerman and Mrs.

8         Westridge -- Miss Westridge were in a

9         personal relationship, and one way to exert

10        pressure on someone is to exert pressure on

11        their family members or significant others.

12        Mrs. Ford may have been clever enough not to

13        directly confront the debtor at her home

14        over this issue, but her actions were just

15        as effective as if she had directed her

16        demand directly to Ann-Marie Westridge,

17        rather than to her estranged brother.

18                Thank you.

19                THE COURT:  Mr. Greher, I will,

20        even though I'm not really supposed to, but

21        I will --

22                MR. GREHER:  I'm fine, Judge, thank

23        you.

24                THE COURT:  If you'll just give me

25        a minute, I need to have a brief recess.

1    But may I say to both counsel thank you very

2    much for a really concise trial.  I

3    appreciate the work that both of you have

4    done, no matter the outcome.  And that's why

5    I say it, so you can hear it now.  Once I

6    make a ruling you might not be able to hear

7    me say thank you for a good trial.

8         MR. GREHER:  Very good.

9         MR. PINSKY:  Thank you, Judge.

10         THE COURT:  Very good.  We'll take

11    a recess.  It should take me about fifteen,

12    twenty minutes.

13         THE CLERK:  All rise.

14

15         (Recess in the proceeding.)

16

17         THE COURT:  First, just to let you

18    know, my ruling is based on the evidence I

19    heard today and not anything else.  I know

20    there are some affidavits in there, but I

21    basically like for the evidence to match the

22    affidavits, and if they don't, I go with

23    what's at the trial.

24         Most of the testimony presented

25    this morning does not need to be repeated.

1     Of course, at some times I'll refer to it in

2     the opinion.  The core facts are simple, and

3     they are simple here, and that is because it

4     takes very little to violate the automatic

5     stay, and the automatic stay is sacrosanct.

6     An act in violation of the automatic stay is

7     to undermine the cornerstone of the

8     bankruptcy process.

9          And let me just add in here, if you

10     want to appeal this, I will give you a

11     written order and give you the cases that

12     I've cited.  On this one it is a 2007

13     bankruptcy case in the Eastern District of

14     New York, Judge Eisenberg In re: Lucock.

15     But I will avoid the cites until such time

16     as you might need them.

17          Section 362(a) of the Bankruptcy

18     Code provides that the filing of a

19     bankruptcy petition operates as a stay

20     applicable to all entities, forbidding

21     various types of conduct, including at (3)

22     any act to obtain possession of property of

23     the estate or property of the estate or to

24     exercise control over the property of the

25     estate, and (6) any act to collect, assess

1       or recover a claim against the debtor that

2       arose before the commencement of the case

3       under this title.  The automatic stay is in

4       effect as of the moment of filing of the

5       bankruptcy petition.  The scope of the

6       automatic stay is extremely broad.  It

7       stops -- and I emphasize -- all collection

8       efforts -- again, I emphasize -- all

9       harassment and all foreclosure actions, and

10      permits the debtor to be relieved of the

11      financial pressures that resulted in the

12      bankruptcy.

13              Because of its fundamental

14      importance, courts must display a certain

15      rigor in reacting to violations of the

16      automatic stay.  Courts have repeatedly said

17      the automatic stay is broad and designed to

18      give the debtor some breathing room and

19      prevent a race among creditors to gain

20      assets.  If the automatic stay is to have

21      substance, it must be construed to enjoin

22      creditors' conduct whenever and however

23      those acts encroach upon a debtor's

24      breathing room and particularly when those

25      acts amount to harassment, intimidation or

1    coercion.

2         I've listened very carefully to the

3    testimony today, and the parties basically

4    agree on the fundamental chain of events,

5    and their testimony was largely consistent.

6    The Fords do not dispute that there was a

7    confrontation between them and the debtor.

8    They do not dispute that they both

9    participated in the confrontation.  The

10   Fords' own testimony confirms that they

11   precipitated the confrontation as the debtor

12   was leaving the Section 341(a) meeting of

13   creditors.  The totality of the Fords'

14   conduct is one of coercive and harassing

15   behavior.  The Court finds that the

16   combination of their conduct, even as the

17   Fords themselves describe it in their

18   separate testimony, was calculated to

19   intimidate the debtor to repay a debt,

20   either an obligation for which they believe

21   she was liable and/or from the funds

22   comprising the bankruptcy estate.

23         The incident in which the Fords

24   confronted the debtor following the meeting

25   of the creditors is sufficient by itself to

1    find by a preponderance of the evidence that

2    the Fords each violated the automatic stay

3    in this case.

4         There is also undisputed testimony

5    as to the second incident, where Kathie Ford

6    went to Miss Westridge's home and spoke with

7    Miss Ford's brother, at the time the

8    debtor's boyfriend, urging him to attempt to

9    collect the debt for the Fords.  The timing

10   of that appearance is impossible to ignore.

11   Miss Ford testified that she had been

12   informed of the change in the status of

13   their claim that very day.  A good deal of

14   the testimony has gone to the precise

15   relationship between Miss Ford's loan to the

16   debtor's business pursuant to a verbal

17   agreement.  Mr. and Mrs. Ford are husband

18   and wife, and they presumably share their

19   marital assets, including a claim for

20   payment from the debtor or her business.

21        Mr. Ford also testified that Miss

22   Ford sometimes takes the initiative

23   concerning their joint affairs.  Steven Ford

24   was listed as a creditor on the debtor's

25   bankruptcy petition, and the Fords believed

1       that they were creditors of the debtor,

2       based on their statement and conduct.

3               And may I read from the 341 notice

4       that goes to all creditors in every case:

5       The debtor is seeking a discharge of most

6       debts, which may include your debt.  A

7       discharge means that you may never try to

8       collect the debt from the debtor.  And that

9       is the precise language in the form that

10      goes out to every creditor.

11              Whether or not the Fords have a

12      claim against the debtor in a legal sense,

13      their conduct and statements, even their

14      joint appearance at the 341 meeting

15      demonstrates their belief that the debtor

16      had the means and the ability to cause the

17      debt to be repaid.  The debt may have once

18      been understood according to a vague verbal

19      agreement between the debtor and Mr. Ford to

20      have been only business between those two

21      parties and between Mr. Ford and the

22      debtor's business.  Regardless, the

23      automatic stay is not so narrow that the

24      Fords can avoid the consequences of their

25      conduct by arguing that they do not have a

1    claim against the debtor in a legal sense,

2    or by arguing that Mrs. Ford is not a

3    creditor who could violate the automatic

4    stay but that because the debt she was

5    trying to collect was owed to her husband

6    and not her.

7        The automatic stay is expressly

8    applicable to all entities and bars any act

9    to collect, assess or recover a claim

10   against the debtor that arose before the

11   commencement of the case under this title,

12   Title 11.

13       The automatic stay also forbids any

14   act to obtain possession of property of the

15   estate or property from the estate or to

16   exercise control over the property of the

17   estate.  Moreover, the term claim is defined

18   in Section 101(5)(a) of the Bankruptcy Code

19   as a right to payment, whether or not such

20   right is reduced to judgment, liquidated,

21   unliquidated, fixed, contingent, matured,

22   unmatured, disputed, undisputed, legal,

23   equitable, secure or unsecured.

24           Section 362(k)(1) of the Bankruptcy

25   Code provides in relevant part:  Any

1   individual injured by any willful violation

2   of a stay provided by this section shall

3   recover actual damages, including cost and

4   attorneys' fees and in appropriate

5   circumstances may recover punitive damages.

6          And I might add litigation over the

7   claim in objection is the proper exercise

8   for the creditors in bankruptcy, of which

9   the creditor has many rights; they just must

10  be exercised in a proper way.

11         Section 362(k)(1) mandates an award

12  of actual damages if an individual where the

13  violation is willful and the Court has

14  discretion to assess punitive damages, any

15  deliberate act taken in violation of the

16  stay which the violator knows to be in

17  existence justifies an award of actual

18  damages.

19         And in this case there is no doubt

20  that there was knowledge of the bankruptcy.

21  There was a written notice given to the

22  Fords, or Mr. Ford, from the Court that is

23  automatic.  And the testimony here today was

24  that Mr. Sapir and Miss Malin both said you

25  need to get an attorney.  Such an act need

1      not be performed with specific intent to

2      violate the stay, rather so long as the

3      violator possesses general intent in taking

4      actions which have the effect of violating

5      the automatic stay, the intent requirement

6      is satisfied.

7            The testimony in this case

8      demonstrates that the Fords had a general

9      intent in taking actions designated to

10     collect payments from the debtor in

11     violation of the automatic stay.  Therefore,

12     the Court finds by preponderance of the

13     evidence their conduct, both individually

14     and when taken together, constituted a

15     willful violation of the automatic stay.

16           Having found a willful violation of

17     the automatic stay in this case, the Court

18     is required to award actual damages incurred

19     by the debtor in this case.  No other damage

20     testimony was offered at trial beyond the

21     debtor's attorney fees and expenses.  The

22     Court will allow reasonable attorneys' fees,

23     and the Fords will have an opportunity to

24     object to the reasonableness of the fees and

25     expenses.

1          The Court must also consider

2     whether an award of punitive damages is

3     appropriate in this case.  Where a party has

4     willfully violated the automatic stay, an

5     additional finding of malicious or bad faith

6     on the part of the offending creditor

7     warrants the further imposition of punitive

8     damages.  And in determining whether

9     punitive damages are appropriate, many

10     courts consider the factors set both in B.

11     Cohen & Sons Catering.  It is an Eastern

12     District of Pennsylvania case, 1989; the

13     nature of the defendant's conduct, the

14     defendant's ability to pay, the defendant's

15     motives and any provocation by the debtor.

16          As a fifth factor, some courts have

17     considered the defendant's level of

18     sophistication.  Punitive damages are

19     awarded in response to a particularly

20     egregious conduct for both punitive and

21     deterrent purposes.  Such awards are

22     reserved for cases in which the defendants'

23     conduct amounts to something more than a

24     bare violation, justifying compensatory

25     damages or injunctive relief.  To recover

1    punitive damages the defendant must have

2    acted with actual knowledge that he was

3    violating the federally protected right or

4    with reckless disregard of whether he was

5    doing so.

6              The integrity of the bankruptcy

7    system will be compromised if creditors are

8    free to confront a debtor using coercive and

9    intimidating conduct insisting upon

10   repayment.  The Court is bound in this case

11   to assess punitive damages award to send a

12   message to these and all creditors that

13   their behavior in this case crossed the line

14   and will not be countenanced or excused.

15             No evidence has been submitted as

16   to the Fords' ability to pay, and the Court

17   cannot make a determination as to the

18   appropriate amount of punitive damages at

19   this time.  Accordingly, the Court will

20   schedule a further hearing to give the Fords

21   an opportunity to appear and present

22   testimony and evidence concerning their

23   ability to pay.  Trial counsel for the

24   debtor is hereby requested to prepare an

25   order awarding actual damages consisting

1      only of attorneys' fees and expenses against

2      the Fords jointly.  This proposed order must

3      be accompanied by attorney time records for

4      the amounts requested and should be

5      submitted to the Fords and their counsel at

6      least ten days prior to the hearing

7      scheduled to consider the punitive damages

8      award.  At the hearing the Fords may also

9      contest the amount of the attorneys' fees

10     requested.

11             We need to set a date for the

12     hearing.  May I hear from you on when you

13     should be ready for this hearing on

14     punitives?  What kind of time frame do you

15     all need?

16             MR. PINSKY:  Your Honor, I think

17     the issue might best be addressed by Mr.

18     Greher and I discussing what kind of

19     information needs to be provided at that

20     hearing.  So I would suggest --

21             THE COURT:  Oh, let's put down a

22     control date.

23             MR. PINSKY:  Thirty days.

24             THE COURT:  Thirty days from now,

25     that's a control date, and then you can ask

```
1        for any time, or whatever you need to do on

2        that.

3                  MR. GREHER:  Okay.

4                  MR. PINSKY:  Does the Court have a

5        calendar on March 17th?

6                  THE COURT:  Yes, I do.

7                  MR. PINSKY:  Could we do it at that

8        time?

9                  MR. GREHER:  What day of the week

10       is that?

11                 THE COURT:  Tuesday.

12                 MR. PINSKY:  Tuesday.

13                 MR. GREHER:  Yeah, I think --

14                 MR. PINSKY:  And that would be just

15       to schedule the final hearing.

16                 MR. GREHER:  And that's just for

17       the purposes of scheduling.

18                 MR. PINSKY:  Although by that time,

19       Your Honor, we ought to be ready to actually

20       tee this thing up.

21                 I do see Mr. Ford shaking his head

22       though, I don't know if he's going to be

23       here.

24                 MRS. FORD:  We'll be here.

25                 MR. PINSKY:  All right, so we could
```

1        do it on the 17th, but that's a Tuesday --

2                THE COURT:  I would prefer that you

3        give me a status on that Tuesday, because I

4        feel it would take time, and to put

5        something like this on a Tuesday is a

6        difficult thing.  As you know, that's our

7        busy day.

8                MR. GREHER:  Yes.

9                MR. PINSKY:  Yes, ma'am.

10               THE COURT:  So what we would do is

11       have the attorneys appear on the 17th and

12       set up a time in order to have the hearing.

13       And at that time you can tell me how far

14       you've gone and what you need and what

15       hasn't been done.

16               MR. PINSKY:  Yes, ma'am.

17               THE COURT:  Mr. Pinsky, you and Mr.

18       Greher need to get together as soon as

19       possible to decide what you need in order to

20       make --

21               MR. PINSKY:  Absolutely.  So Your

22       Honor, what time on the 17th would be good?

23               THE COURT:  10:30, 11:30.  Help me

24       here.

25               MR. PINSKY:  10:30 is the

1    miscellaneous calendar, that sounds good.

2         THE COURT:  Let's make it 10:30.

3         Mr. Greher, any objection to that

4    date?

5         MR. GREHER:  No, Your Honor.

6         THE COURT:  Very good.  Court is in

7    recess.

8         MR. PINSKY:  Thank you, Your Honor.

9         THE CLERK:  All rise.

10

11        (Whereupon, the above-captioned

12   proceedings concluded.)

13              OOO

14

15        C E R T I F I C A T I O N

16   I certify that the foregoing is a correct

17 transcript from the OFFICIAL COPY of electronic

18 sound recording of the proceedings in the

19 above-entitled matter.

20

21

22   KAREN SCHMIEDER    25 March 2009

23

24

25

1                    I N D E X

2

3    WITNESSES:              D    X    RD   RX   Court

4    Ann-Marie Westridge     11   27   51   55   25

5    Andrea Malin            58   72   –    –    –

6    Sandra Raymond          85   87   –    –    –

7    William Helgerman       96   100  –    –    –

8    Steven Ford             111  115  –    –    –

9    Kathleen Ford           119  127  –    –    –

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25